SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                    )  Arizona Supreme Court
                                     )  No.  CR-03-0355-AP
        Appellee/Cross-Appellant,    )
                                     )  Maricopa County
                    v.               )  Superior Court
                                     )  No.  CR 2001-095385
FRANK SILVA ROQUE,                   )
                                     )
        Appellant/Cross-Appellee.    )  **O P I N I O N**
_____)

Appeal from the Superior Court in Maricopa County
The Honorable Mark F. Aceto, Judge

**CONVICTIONS AFFIRMED; SENTENCE REDUCED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
          Vincent L. Rabago, Assistant Attorney General   Tucson
Attorneys for the State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER            Phoenix
     By   Stephen R. Collins, Deputy Public Defender
          Anna M. Unterberger, Deputy Public Defender
Attorneys for Frank Silva Roque

_____

**B E R C H**, Vice Chief Justice

¶1      In September 2003, a jury found Appellant Frank Silva
Roque guilty of first degree murder, attempted first degree
murder, reckless endangerment, and three counts of drive-by
shooting.  He was sentenced to death for the murder.  This court
has jurisdiction of this capital appeal under Article 6, Section

5(3) of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

## I. FACTS AND PROCEDURAL BACKGROUND

¶2 Frank Roque was at work at Boeing on September 11, 2001, when he heard the news of the terrorist attacks in New York, Pennsylvania, and Washington, D.C. When Roque returned home that afternoon, he cried uncontrollably and babbled incoherently as he watched the news coverage of the attacks. Roque also cried and carried on that evening when he phoned his brother, Howard.

¶3 Although Roque normally never missed work, he stayed home on September 12. When a colleague from Boeing called Roque that evening or the next, Roque told him that he wanted to shoot some "rag heads," referring to people Roque perceived to be of Arab descent.

¶4 On the morning of September 15, Roque drank approximately three twenty-five-ounce cans of beer. Early that afternoon, Roque drove his truck to a Chevron gas station in Mesa. The owner of the gas station, Balbir Singh Sodhi, a Sikh of Indian descent who wore a turban, was standing outside talking to landscape worker Louis Ledesma, who was down on his knees. Roque fired five or six shots through the open window of his truck, killing Sodhi. He then sped off.

¶5 Roque next drove to a home that he had previously

owned and had sold to the Sahaks, an Afghan couple. From the driver's side of his truck, he fired at least three shots at the house. Although family members were home, nobody was injured. Then Roque drove to a Mobil gas station, where he fired seven shots through the convenience store window at store clerk Anwar Khalil, a man of Lebanese descent. Five bullets struck below the store counter and two bullets struck above it, but Khalil was not hit. Roque sped off in his truck. That afternoon, Roque was seen in several area bars, where he reportedly paced, cried, talked gibberish, and ranted at the televisions.

¶6     The police investigation of the shootings soon led to Roque, and he was arrested at his home on the evening of September 15. When the police arrived, Roque immediately put his hands in the air and said, "I'm a patriot and American. I'm American. I'm a damn American." As they drove to the police station in the patrol car, Roque yelled at the arresting officers, "How can you arrest me and let the terrorists run wild?" Roque added, "I wish that my punishment would be sending me to Afghanistan with a lot of [expletive] weapons."

¶7     Roque was brought to trial for the first degree murder of Balbir Sodhi, attempted first degree murder of Anwar Khalil, reckless endangerment of Louis Ledesma, and drive-by shootings at the Chevron station, the Mobil station, and the Sahak residence. The State filed a notice of intent to seek the death

penalty, asserting two aggravating circumstances: Roque "was previously convicted of a serious offense," A.R.S. § 13-703(F)(2) (Supp. 2003), and, in committing the murder, Roque "knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense," A.R.S. § 13-703(F)(3).

¶8 The State's theory of the case was that the shootings were intentional acts of racism. Roque did not deny the shootings, but pursued an insanity defense. Six experts — three psychiatrists and three psychologists — testified at trial regarding Roque's mental health.

¶9 The same jury sat for the guilt proceeding and the sentencing proceeding. The jury found Roque guilty of all charges and rendered a verdict of death for the murder. The court imposed aggravated sentences of 12 years each for the attempted first degree murder and drive-by shooting convictions and 1.25 years for the reckless endangerment conviction.[1]

---

[1] The sentences for the convictions arising from the shooting at the Chevron station — first degree murder (death), drive-by shooting (12 years), and reckless endangerment (1.25 years) — run concurrently with one another. The sentences for the convictions arising from the shooting at the Mobil station — attempted first degree murder (12 years) and drive-by shooting (12 years) — run concurrently with each other but consecutively to the other sentences. The sentence for the drive-by shooting at the Sahak residence (12 years) runs consecutively to the other sentences. Roque has not challenged the structure of the sentencing.

## II. DISCUSSION

¶10    Roque raises thirty issues on appeal and identifies ten additional issues to avoid preclusion.  The State raises one issue on cross appeal.

### A.    Jury Selection

#### 1.    Peremptory Strike of Veniremember

¶11    During jury selection, the trial court denied Roque's challenge to the State's peremptory strike of Juror 97, an African American veniremember.  In *Batson v. Kentucky*, the Supreme Court held that excluding a potential juror on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment.  476 U.S. 79, 89 (1986).

¶12    We review a trial court's decision regarding the State's motives for a peremptory strike for clear error.  *State v. Murray*, 184 Ariz. 9, 24, 906 P.2d 542, 557 (1995).  "We give great deference to the trial court's ruling, based, as it is, largely upon an assessment of the prosecutor's credibility." *State v. Cañez*, 202 Ariz. 133, 147, ¶ 28, 42 P.3d 564, 578 (2002).

¶13    A *Batson* challenge proceeds in three steps:  "(1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether

the challenger has carried its burden of proving purposeful racial discrimination." *Id.* at 146, ¶ 22, 42 P.3d at 577 (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995)).

¶14 The trial court found that Roque made a prima facie case of discrimination, satisfying the first step. To satisfy the second, the prosecutor offered three race-neutral reasons for the strike: (1) Juror 97 had a brother in prison; (2) he had some personal problems with police officers that he attributed to racial motivation; and (3) he expressed his belief that the death penalty is imposed more frequently on members of minority groups. Roque offered nothing further to support his challenge. The trial court ruled that the State's peremptory strike was not racially motivated and did not constitute purposeful discrimination.

¶15 Because the Defendant bears the burden to prove purposeful discrimination, this court will not reverse the trial court's determination unless the reasons provided by the State are clearly pretextual. No such pretext is evident in this record. The veniremember's statements provide valid reasons for the prosecutor to question this potential juror's impartiality. Antipathy toward the police alone may constitute a valid reason to strike jurors when the State's case relies on police testimony. Moreover, the prosecutor did not strike all African American jurors from the panel. Although not dispositive, "the

fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive." *State v. Eagle*, 196 Ariz. 27, 30, ¶ 12, 992 P.2d 1122, 1125 (App. 1998), *aff'd*, 196 Ariz. 188, 994 P.2d 395 (2000).  Roque did not prove purposeful racial discrimination.  Accordingly, the trial court did not clearly err in allowing the strike of Juror 97.

2.  <u>Excusing Veniremembers Who Objected to the Death Penalty</u>

¶16    Roque contests the exclusions for cause of Veniremembers 9, 49, and 88, who expressed doubt that they could impose the death penalty.  We review a trial court's decision to strike potential jurors for cause for an abuse of discretion, *State v. Glassel*, 211 Ariz. 33, 47, ¶ 46, 116 P.3d 1193, 1207 (2005), deferring to the trial judge's superior opportunity to observe the jurors' demeanor and credibility, *see Wainwright v. Witt*, 469 U.S. 412, 428 (1985).

¶17    In a capital case, the judge may exclude for cause those jurors who would never vote for the death penalty, but not those who have "conscientious or religious scruples against the infliction of the death penalty" that they could set aside. *Witherspoon v. Illinois*, 391 U.S. 510, 515 & n.9 (1968).  To serve as a basis for exclusion, the juror's views must "prevent or substantially impair the performance of his duties as a juror."  *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*,

448 U.S. 38, 45 (1980)); *see also State v. Anderson* (*Anderson I*), 197 Ariz. 314, 318-19, ¶ 9, 4 P.3d 369, 373-74 (2000). The State need not prove a juror's opposition to the death penalty with "unmistakable clarity," *Wainwright*, 469 U.S. at 424, but follow-up questions should be asked if written responses do not show that the juror will be able to follow the law, *Anderson I*, 197 Ariz. at 319, ¶ 10, 4 P.3d at 374.

¶18      Based on a juror's comments and demeanor, a judge may excuse even a juror who promises to apply the law. In *Glassel*, for example, "juror 16" called the death penalty "barbaric" and said he was "absolutely" against it on a written questionnaire, but then promised to apply the law during voir dire questioning. 211 Ariz. at 48, ¶ 49, 116 P.3d at 1208. This court upheld the exclusion for cause of that juror. *Id.* ¶ 50. "[E]ven assuming that juror 16 was sincere about being able to apply the law, the judge could have reasonably determined that the juror's views would substantially impair his ability to deliberate impartially." *Id.*

¶19      Here, the three excused potential jurors expressed ambivalence about their ability to impose the death penalty. All said they could probably follow the law but were not sure if they could enter a verdict of death. Juror 49 replied "yes" when asked, "It sounds like you believe the death penalty is okay, but you are not sure that you could vote for it; is that

true?" The prosecutor asked Juror 9 if it was possible, "despite the evidence and the law, . . . because of how it makes you feel, how it impacts you, that you couldn't [impose the death penalty]?" She responded, "There is a possibility, certainly." The court asked Juror 88, "Are you sure you can . . . decide this case based on the law without the influence of your personal opinions about the death penalty?" She responded, "I would like to think that I could but I also [have] never been put in that position to have to make that choice." In each case, the judge concluded that the juror might be unable to vote to impose a death sentence based on his assessment of the jurors' responses.

¶20 As *Wainwright* recognizes, it is sometimes impossible to ask enough questions to make a potential juror's feelings clearly known, and the judge witnessing the questioning may maintain a lingering impression of bias. 469 U.S. at 424-25. *Wainwright* approved the exclusion of a juror who was "afraid" her beliefs might affect her ability to impose the death penalty. *Id*. at 416, 435. In light of each juror's hesitation to promise to disregard personal feelings about the death penalty, we conclude that the judge did not abuse his discretion in excluding these three jurors for cause.

**B.    Evidentiary Rulings During the Guilt Proceeding**

1.    <u>Non-disclosure of Expert Testimony</u>

¶21    Roque claims that the trial court erred in not precluding Dr. Ben-Porath, an expert for the State, from testifying regarding Roque's mental illness because that testimony had not been properly disclosed to the defense under Rule 15.1(a)(3) of the Arizona Rules of Criminal Procedure. The scope of disclosure required under Rule 15.1(a)(3) is a question of law that we review de novo, *see State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004), while we review the judge's assessment of the adequacy of disclosure for an abuse of discretion, *State v. Piper*, 113 Ariz. 390, 392, 555 P.2d 636, 638 (1976). We also review for abuse of discretion the trial judge's imposition of a sanction for non-disclosure. *State v. Armstrong*, 208 Ariz. 345, 353-54, ¶ 40, 93 P.3d 1061, 1069-70 (2004).

*a.    Background*

¶22    Because Roque did not dispute committing the crimes for which he was charged, the only question during the guilt proceeding was whether he was legally insane at the time he committed them. The defense called a psychologist, Dr. Barry, and a psychiatrist, Dr. Rosengard, who testified that Roque was legally insane at the time of the shootings. The State countered with Dr. Scialli, a psychiatrist who testified that

Roque was not legally insane at the time of the shootings.

¶23    As part of his assessment of Roque's mental condition, Dr. Barry conducted five diagnostic tests, including the Miller Forensic Assessment of Symptoms Test (M-FAST), a tool for determining whether a subject is malingering, and the Minnesota Multiphasic Personality Inventory 2 (MMPI-2), a tool for assessing mental illness. The MMPI-2 requires the subject to respond to 567 true-or-false statements by filling in a bubble on an answer sheet. Because other diagnostic tests had revealed that Roque had poor visual motor function, Dr. Barry administered the MMPI-2 to Roque by reading the statements aloud and recording Roque's answers for him.

¶24    Several months before trial, the State informed the defense that it intended to call a nationally known MMPI-2 expert, Dr. Ben-Porath, to testify that oral administration of the MMPI-2 invalidates the results. In an interview, the defense asked Dr. Ben-Porath how it might rehabilitate the MMPI-2 results acquired from Dr. Barry's oral testing of Roque. Dr. Ben-Porath recommended letting at least six months pass before re-administering the MMPI-2 to Roque to avoid a possible "practice effect."[2]

---

[2]    The other psychologists who testified at trial disagreed that any "practice effect" arises from re-administering the MMPI-2 because of the length of the test — 567 questions — and

¶25    The defense hired Dr. Toma to re-administer the MMPI-2 to Roque.  The re-test occurred three and one-half months after the first administration of the MMPI-2 and two days after voir dire began.  Dr. Toma provided the new results to Dr. Barry, who scored and incorporated them in his assessment of Roque.  The defense also notified the State of Dr. Toma's testing and disclosed the results.

¶26    At trial, the defense called Drs. Rosengard and Barry to testify regarding Roque's mental condition at the time of the crimes.  Before the defense rested, the State called Dr. Ben-Porath out of order in rebuttal.  The State had disclosed to the defense only that Dr. Ben-Porath would testify regarding the validity of the *administrations* of the MMPI-2.  However, on the stand, Dr. Ben-Porath began to *interpret* the results of Roque's MMPI-2 tests.  The defense immediately objected that the doctor's testimony fell outside the scope of disclosure, pointing out that the State had neither disclosed any written report from Dr. Ben-Porath nor outlined his opinion.  Citing Arizona Rule of Criminal Procedure 15.1(a)(3), the defense asserted that the State was obligated to disclose "an overview" of the expert's testimony, including an "outline" of his opinion or a "written report."

the fact that it does not test knowledge, but rather tests reaction to certain statements.

- 12 -

¶27    The judge concluded that the State would have had to disclose any written report generated by Dr. Ben-Porath, but did not have to create an overview of his testimony. The judge therefore found no disclosure violation, but nonetheless proposed giving the defense the remainder of the afternoon, commencing at approximately 3:15 p.m., to interview Dr. Ben-Porath. The defense attorney declined, saying that he could not effectively challenge Dr. Ben-Porath's expanded testimony on such short notice. The judge ruled that Dr. Ben-Porath could continue to testify, and the doctor proceeded to analyze Roque's MMPI-2 results in detail.

¶28    Dr. Ben-Porath then began to analyze the results of the M-FAST that Dr. Barry had administered to Roque. The defense again objected, this time because Dr. Ben-Porath was testifying regarding a diagnostic tool other than the MMPI-2. The judge overruled the objection. Dr. Ben-Porath proceeded to opine on the critical questions of whether the MMPI-2 results indicated that Roque had mental disorders and whether the M-FAST results indicated malingering.

¶29    The prosecutors conceded below that they had not revealed to the defense that Dr. Ben-Porath would testify to anything other than the proper administration of the MMPI-2. Recognizing that their failure to disclose the scope of Dr. Ben-Porath's testimony might create an appellate issue, the lead

prosecutor said, "I don't suppose an appellate court cares whether I'm sorry about something but I think we had . . . a miscommunication." The prosecutor then said he would not object if the defense had to hire another expert to rebut Dr. Ben-Porath's testimony because of the "miscommunication."

> b. *The Scope of Disclosure Required under Rule 15.1(a)(3)*

¶30     Arizona Rule of Criminal Procedure 15.1(a)(3)[3] addresses the scope of disclosure of expert testimony in criminal cases. It requires the State to provide or make available to the defendant

> [t]he names and addresses of experts who have personally examined a defendant or any evidence in the particular case, together with the results of physical examinations and of scientific tests, experiments or comparisons, including all written reports or statements made by them in connection with the particular case.

Ariz. R. Crim. P. 15.1(a)(3). Arizona Rule of Criminal Procedure 15.6 makes the duty to disclose a continuing obligation.

¶31     The trial court's interpretation of Rule 15.1(a)(3) as requiring the production only of a "written report or statement" derives from the rule's participial phrase, "including all

---

[3]     After Roque's trial was completed, Rule 15.1(a) was revised and Rule 15.1(a)(3) was renumbered as Rule 15.1(b)(4), effective December 1, 2003. This opinion cites the version applicable to Roque's trial.

written reports or statements made by [experts] in connection with the particular case."  But the "including" language does not limit disclosure of the "results of physical examinations and of scientific tests, experiments or comparisons" to "written reports or statements."  Typically, the word "including" is "not one of all-embracing definition, but connotes simply an illustrative application of the general principle."  *Bernhart v. Indus. Comm'n*, 200 Ariz. 410, 413, ¶ 12, 26 P.3d 1181, 1184 (App. 2001) (quoting *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)).

¶**32**     The purpose of Rule 15.1(a)(3) is "to give full notification of each side's case-in-chief so as to avoid unnecessary delay and surprise at trial."  *Armstrong*, 208 Ariz. at 353, ¶ 38, 93 P.3d at 1069 (quoting *State v. Dodds*, 112 Ariz. 100, 102, 537 P.2d 970, 972 (1975)).  The rule was "designed to give the defendant an opportunity to check the validity of the conclusions of an expert witness and to call such expert as his own witness or to have the evidence examined by his own independent expert witness."  *State v. Spain*, 27 Ariz. App. 752, 755, 558 P.2d 947, 950 (1976).

¶**33**     The Supreme Court has described the policy underlying the discovery rules as facilitating the search for truth and preventing surprise:

- 15 -

> [I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a "search for truth" so far as defense witnesses are concerned, while maintaining "poker game" secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.

*Wardius v. Oregon*, 412 U.S. 470, 475-76 (1973) (footnote omitted). Arizona's policy serves similar goals:

> However so it may appear at times, a criminal trial is not a contest of wits and tactics between the prosecution and defense counsel. "We believe justice dictates that the defendant be entitled to the benefit of any *reasonable* opportunity to prepare his defense and to prove his innocence."

*State ex rel. Helm v. Superior Court* (*Deddens*), 90 Ariz. 133, 139, 367 P.2d 6, 10 (1961) (quoting *State ex rel. Mahoney v. Superior Court* (*Stevens*), 78 Ariz. 74, 79, 275 P.2d 887, 890 (1954)).

¶34 Few Arizona cases have touched on the scope of disclosure required under Rule 15.1(a)(3). By contrast, a number of cases have addressed the scope of disclosure required under other rules. *See, e.g.*, *State v. Williams*, 183 Ariz. 368, 379, 904 P.2d 437, 448 (1995) ("Rule 15.1(a)(1) requires the state to disclose the names of all [non-expert] witnesses together with their relevant written or recorded statements," but does "not require the state to explain how it 'intends' to use each of its witnesses."); *Englert v. Carondelet Health*

- 16 -

*Network*, 199 Ariz. 21, 25, ¶¶ 6-7, 13 P.3d 763, 767 (App. 2000) (Rule 26.1 of the Arizona Rules of Civil Procedure requires a party to disclose "a 'fair description' of each witness's expected testimony, and 'the substance of the facts and opinions' of each expert's expected testimony," but not a "detailed 'scripting' of expected testimony."). But the other rules do not include the language contained in Rule 15.1(a)(3) requiring disclosure of "results of physical examinations and of scientific tests, experiments or comparisons," and these cases are therefore of limited value in interpreting Rule 15.1(a)(3).[4]

¶35    Nor do the two published Arizona opinions analyzing Rule 15.1(a)(3) control this case. In *State v. Ramirez*, this court considered whether surprise, unwritten testimony by the state's expert as to the defendant's mental illness violated Rule 15.1(a)(3). 116 Ariz. 259, 267, 569 P.2d 201, 209 (1977). But in that case, unlike this one, the state had not known that

---

[4]    Arizona Rule of Civil Procedure 26.1(a)(6) is broader than Criminal Rule 15.1(a)(3). Rule 26.1(a)(6) requires disclosure of "the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify," and "a summary of the grounds for each opinion." The federal counterpart to Rule 15.1(a)(3) is also broader than Arizona's rule, requiring the government to submit "to the defendant a written summary of any testimony that the government intends to use . . . as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G).

its expert had made an assessment, so the relevant results were not within the prosecutor's "possession or control" as required by the then-current version of Rule 15.1(a)(3).[5] *Id.* at 268, 569 P.2d at 210.

¶36 In *Spain*, the court of appeals considered whether an undisclosed in-court voice identification by the victim violated Rule 15.1(a)(3). 27 Ariz. App. at 755, 558 P.2d at 950. The court ultimately found no disclosure violation because Rule 15.1(a)(3) applies only to "expert testimony" and "clearly pertains only to examinations, tests, experiments and comparisons which have already been completed." *Id.* Roque's case indisputably involves expert testimony.

¶37 No Arizona opinion pertaining to Rule 15.1(a)(3) addresses a case in which the state knew that its expert had an opinion on an issue to which he intended to testify, yet failed to disclose it. Nor have we faced a situation in which a party affirmatively represented that its expert would testify only regarding the methodology of one test (MMPI-2), and then had the expert interpret the results not only of that test, but also of

---

[5] After Roque's trial was completed, the Rules were revised to make clear that the prosecutor's obligations to disclose are not limited to information within "the prosecutor's possession or control," but also encompass information within the control of certain other people, including "[a]ny other person who has participated in the investigation or evaluation of the case and who [is] under the prosecutor's direction or control." Ariz. R. Crim. P. 15.1(f).

another test (M-FAST) about which no disclosure was made. Finally, we have never faced a case under Rule 15.1(a)(3) in which an expert made no notes or reports whatsoever in an area this complex, involving the interpretations of two tests consisting of more than 1100 responses and the results of a third assessment test. Courts in other states, however, have addressed whether "results of physical examinations and of scientific tests, experiments or comparisons" must be disclosed even if unwritten.

¶38 The Kentucky Supreme Court considered whether a defendant was entitled to disclosure of the Commonwealth's expert's conclusion that traces of blood found on the defendant's hands and arms were traceable to the victim. *Barnett v. Commonwealth*, 763 S.W.2d 119, 123 (Ky. 1988). The expert did not include this opinion in his report, which had been given to the defense. *Id.* After considering the Kentucky analog to Arizona Rule 15.1(a)(3), which required disclosure of "results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case," that court held it to be reversible error that the expert's report did not contain this "significant piece of information, the expert's opinion as to what the physical findings indicated." *Id.*

¶39 An Ohio court of appeals similarly concluded that, in

combination with other errors, failure to disclose an important expert opinion by not including it in the expert's report constituted reversible error. *State v. Karl*, 757 N.E.2d 30, 34–35, 40 (Ohio Ct. App. 2001). Ohio's version of Arizona Rule 15.1(a)(3) requires the state to "disclose the results or reports of scientific tests made in connection with the case that are known or by due diligence may become known to the prosecutor." *Id.* at 35 (citing Rule 16(B)(1)(d) of the Ohio Rules of Criminal Procedure). On a question of forgery, the state's expert had concluded that the defendant's handwriting matched a signature in question, but had not included that finding in the report provided to the defendant. *Id.* The court found it "apparent that the prosecutor knew" of the expert's opinion from his questioning on direct examination. *Id.* The failure to disclose this important finding violated the intent of the disclosure rule and prejudiced the defendant by potentially eliminating any reasonable doubt in the minds of the jurors without giving the defense the opportunity to call its own witness to rebut the evidence. *Id.*

¶40 Consistent with this case law, we hold that Rule 15.1(a)(3) applies even if an expert has not written down the "results of physical examinations and of scientific tests, experiments or comparisons," as long as such results are known to the state. Such a reading of Rule 15.1(a)(3) serves to avoid

surprise and delay at trial, *Armstrong*, 208 Ariz. at 353, ¶ 38, 93 P.3d at 1069, and to allow a party time to check the conclusions of the opposing party's expert and call an expert in rebuttal, if necessary, *Spain*, 27 Ariz. App. at 755, 558 P.2d at 950. We therefore conclude, under these facts, that the trial court erred in ruling that Rule 15.1(a)(3) requires that only a "written report or statement" need be disclosed.

    *c. The Adequacy of the State's Disclosure*

**¶41** Dr. Ben-Porath's testimony far exceeded a discussion of the validity of an oral administration of the MMPI-2 followed three months later by a paper administration of the test. Dr. Ben-Porath analyzed several of Roque's scores from both test administrations, such as those indicating bizarre mentation. Indeed, Dr. Ben-Porath testified to the ultimate question in dispute, opining that Roque's MMPI-2 scores did not indicate that Roque had any of several mental conditions about which the prosecutor questioned him. On this critical issue, Dr. Ben-Porath was the only expert to find no evidence of mental illness. Dr. Ben-Porath also testified that Roque's M-FAST score indicated malingering, and he offered a general psychological opinion in response to a juror's question.

**¶42** Dr. Ben-Porath's testimony clearly revealed that he had completed his analysis before taking the stand. For example, with regard to Dr. Barry's interpretation of Roque's M-

- 21 -

FAST score, Dr. Ben-Porath testified as follows:

> Well, clearly, [Roque] didn't reach the threshold for declaring he's malingering because you needed to get a score of five, of six, excuse me. The part that I found significant was when I read Dr. Barry's interpretation of that score he said the score of five indicates [Roque] wasn't malingering. That is not true. It's still a very high score.

Discussing Roque's bizarre mentation scores on the MMPI-2, Dr. Ben-Porath acknowledged that he had reviewed Dr. Toma's report to reach his own conclusions about Roque's mental condition.

¶43      The questioning by the State also makes clear that the prosecutor knew of Dr. Ben-Porath's scientific conclusions before the doctor took the stand, satisfying the requirement in the then-applicable version of Rule 15.1(a)(3) that the information be "within the prosecutor's possession or control." In considering the defense's disclosure objection, the court said to the prosecutor, "So you want to talk about, number one, there [are] differences [between the two MMPI-2 tests], and number two, Dr. Barry's interpretation is wrong and the real interpretation or the accurate interpretation should be this." The prosecutor replied, "Right. So [for] example, Dr. Barry said that this shows signs of schizotypal personality [disorder]. The test itself will show that that's not the case. So it's the interpretation — it's what the test is actually saying." It was also clear in the line of questioning throughout the direct examination that the prosecutor already

knew the conclusions to which Dr. Ben-Porath would testify. The State therefore should have disclosed that information to the defense under Rule 15.1(a)(3).

¶44 The State argues that the defense should have anticipated that Dr. Ben-Porath "would testify regarding what the defense expert relied on, as well as the defense expert's evaluation." But the record does not bear this out. The State had engaged Dr. Ben-Porath, an expert in the administration of the MMPI-2, to support its contention that the oral administration of the MMPI-2 invalidated the results, and it had disclosed only that information to the defense. That disclosure was not sufficient to put the defense on notice that Dr. Ben-Porath had interpreted Roque's scores on the MMPI-2 and M-FAST tests and assessed Roque's mental health.

¶45 Moreover, the State had retained another expert, Dr. Scialli, to assess Roque's mental health and had disclosed to the defense his report opining that Roque was not legally insane at the time he committed the crimes. The defense should therefore not have been expected to infer that Dr. Ben-Porath also would testify regarding the ultimate issue.

¶46 Nor would the defense necessarily have expected Dr. Ben-Porath to testify on the ultimate issue of Roque's mental health based solely on tests previously administered to Roque by others. All other experts who testified stressed the importance

of personally interviewing the subject and reviewing collateral information in addition to analyzing test results before assessing a subject's mental health. Dr. Ben-Porath had neither interviewed Roque nor examined any collateral information.

¶47    We also find unconvincing the State's explanation that it failed to disclose Dr. Ben-Porath's findings because it "did not learn that a second test had been administered (by Dr. Toma) until trial began." In his interview by the defense more than a month before trial, which the prosecutor attended, Dr. Ben-Porath had recommended that a second MMPI-2 test be administered to Roque to remedy the problems with the first administration. Dr. Ben-Porath advised the defense to wait as long as possible to re-administer the test to ameliorate any practice effect. In light of its own expert's advice, the State should not have been surprised that the defense delayed as long as possible before having the MMPI-2 re-administered to Roque.

¶48    Nor did the re-administration of the MMPI-2 test cause the expansion of Dr. Ben-Porath's testimony. The State's intention to have Dr. Ben-Porath testify on his conclusions regarding Roque's M-FAST and first set of MMPI-2 results, for example, could have been disclosed to the defense when the State hired Dr. Ben-Porath, because the State already possessed those results at that time. But the State disclosed only that it intended for Dr. Ben-Porath to testify regarding the proper

procedure for administering the MMPI-2.  The State's failure to fully and fairly disclose to the defense the results of Dr. Ben-Porath's assessment of Roque's mental health, the critical issue in this capital case, violated Rule 15.1(a)(3).

### d.  *The Proposed Sanction*

¶49        In this case, although the trial court did not find a disclosure violation, it nonetheless sought to avoid any prejudice from the nondisclosure.  When the defense objected to Dr. Ben-Porath's expanded testimony, the judge proposed that the court break for the day at 3:15 p.m. to allow the defense to interview Dr. Ben-Porath.  The defense declined to do so.

¶50        Arizona Rule of Criminal Procedure 15.7 provides several sanctions that the trial court may impose for non-compliance with the rules of discovery, including "granting a continuance" or "[p]recluding a party from calling a witness, offering evidence, or raising a defense not disclosed."  In selecting the appropriate sanction, the trial court

> should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible since the Rules of Criminal Procedure are designed to implement, not to impede, the fair and speedy determination of cases.  Prohibiting the calling of a witness should be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice.  The court should also consider how vital the precluded witness is to the proponent's case, whether the opposing party will be surprised and prejudiced by the witness' testimony, whether the discovery violation was

> motivated by bad faith or willfulness, and any other
> relevant circumstances.

*State v. Fisher*, 141 Ariz. 227, 246, 686 P.2d 750, 769 (1984) (citations omitted). Even though the superior court found no violation of the Rule here, had it done so, the short continuance offered by the trial judge was an appropriate initial approach to resolving the issue.

¶51        If a discovery dispute arises, the parties must make good faith efforts to resolve it. When the trial court imposes a sanction, a party may not simply decline it in the hope that the court will substitute a more stringent sanction. Because precluding the testimony of a witness should ordinarily not be the trial court's sanction of first resort, *see id.*, we cannot say that the trial court acted unreasonably here in initially proposing a short continuance. The defense should have accepted the opportunity to interview Dr. Ben-Porath to determine whether the defense required additional time or witnesses to adequately prepare its rebuttal. If more time was then needed, the defense could have requested an appropriate continuance or suggested another approach. Because the defense categorically rejected the trial court's initial attempt to resolve the dispute, however, we cannot now fully assess the prejudice the defense may ultimately have suffered. *See Paragon Bldg. Corp. v. Bankers Trust Co.*, 116 Ariz. 87, 89, 567 P.2d 1216, 1218 (App.

1977). We therefore cannot conclude that the trial court abused its discretion in failing to grant further relief.

¶52        By failing to disclose the scope of Dr. Ben-Porath's testimony, the State engaged in improper conduct. *See State v. Tucker*, 157 Ariz. 433, 441, 759 P.2d 579, 587 (1988) (observing that, without reversal, counsel may consider admonition only a "verbal spanking"). But because the trial court imposed an appropriate initial sanction that the defense refused to accept, we cannot conclude that the trial court's failure to preclude Dr. Ben-Porath's testimony constitutes reversible error.[6]

### 2.   Admission of Prior Conviction Evidence

¶53        Dr. Scialli, a State expert, testified that in assessing Roque's mental health, he considered Roque's 1983 attempted robbery conviction. Citing Arizona Rule of Evidence 403, Roque asserts that the judge erred in allowing evidence of the conviction because its prejudicial effect substantially outweighed its probative value. We review this evidentiary ruling for an abuse of discretion. *See State v. Aguilar*, 209 Ariz. 40, 49, ¶ 29, 97 P.3d 865, 874 (2004).

¶54        Generally, evidence of other wrongs may not be used "to show that a defendant is a bad person or has a propensity

---

[6]    We do consider the State's failure to disclose the extent of Dr. Ben-Porath's testimony in assessing whether cumulative prosecutorial misconduct warrants reversal in this case. *See infra* ¶¶ 162-65.

for committing crimes." *State v. Amarillas*, 141 Ariz. 620, 622, 688 P.2d 628, 630 (1984) (citation omitted); *see also* Ariz. R. Evid. 404(b). "When insanity is at issue, [however,] evidence of prior bad acts is admissible if relevant, Ariz. R. Evid. 402, and if the probative value of the evidence is not substantially outweighed by unfair prejudice, Ariz. R. Evid. 403." *State v. Vickers*, 159 Ariz. 532, 540, 768 P.2d 1177, 1185 (1989).

¶55      In *State v. Amarillas*, for example, we found the prior bad acts of a defendant who asserted an insanity defense relevant to prove lack of mental illness. 141 Ariz. at 622-23, 688 P.2d at 630-31. Amarillas argued that his crimes resulted from paranoid delusions; the state countered that the crimes were alcohol-induced. *Id.* Because Amarillas had committed other crimes while intoxicated, evidence of those crimes suggested that alcohol, rather than paranoid delusions, likely induced the criminal acts. *Id.* We concluded that evidence of the prior bad acts was relevant and there was no error in admitting it. *Id.* Similarly, in *Vickers* we concluded that evidence of prior bad acts was not outweighed by unfair prejudice, and the trial court therefore did not abuse its discretion in admitting that evidence. 159 Ariz. at 540, 768 P.2d at 1185 (no abuse of discretion in admitting prior bad acts to show that the defendant's crimes were not "random [or] senseless" on account of temporal lobe epilepsy, but rather were

deliberate).

¶**56**      Here, however, the judge permitted an expert to testify regarding his reliance on the conviction in assessing Roque's mental health.  Roque does not contest that evidence of his previous conviction is the type of evidence reasonably relied upon by experts in making mental health assessments. Under the Rules of Evidence, therefore, the evidence may be disclosed as forming the basis of an opinion without regard to its independent admissibility.  *See* Ariz. R. Evid. 703.  Roque claims, however, that the mention of the conviction was so unduly prejudicial that it outweighed the probative value of the evidence.

¶**57**      We agree that Roque's 1983 attempted robbery conviction had only minimal probative value in showing a lack of mental illness because the State did not produce evidence that the attempted robbery was alcohol-induced or that it was motivated by racism, which were its theories at trial.  Nor did Dr. Scialli's testimony demonstrate the relevance of the 1983 conviction to his assessment of Roque's mental health.  *See Ex parte Vaughn*, 869 So. 2d 1090, 1097, 1099 (Ala. 2002) (finding probative value of prior bad acts substantially outweighed by prejudice where state "presented nothing to indicate that the prior acts committed by [defendant] were relevant to his mental state during the shooting that occurred . . . many years

later").

¶58    But if the probative value of the conviction was minimal, so was any prejudicial effect.  The jury heard of the conviction from at least two other experts, Dr. Potts and Dr. Rosengard, who testified that because of the age of the conviction and lack of violence involved, it did not affect their assessments of Roque's mental health.  Moreover, Roque admitted doing the acts that constituted the crimes for which he was charged in this trial, so the jury did not rely on the prior conviction to conclude that Roque may have acted in conformity with it in committing the present crimes.  Finally, we note that the trial judge offered to give a limiting instruction advising the jurors to consider the conviction only as information relied upon by the expert, but Roque declined the offer.

¶59    We conclude in these circumstances that any prejudicial effect of the conviction does not substantially outweigh its minimal probative value.  The judge therefore did not abuse his discretion in allowing evidence of the conviction.

   3.   Exclusion of Testimony as Hearsay

¶60    Roque's sister Sylvia testified regarding their mother's mental illness.  On cross-examination, the prosecutor asked Sylvia if her mother had ever physically hurt her.  Sylvia replied, "I was told that she once tried to push me into traffic by my grandmother."  The prosecutor objected on hearsay grounds,

and the judge sustained the objection. The judge then said, "That testimony is stricken from the record. It's inadmissible under the rules of evidence as not being reliable. Please disregard it."

¶61     Roque asserts that Sylvia's statement was material because it showed that a family member's mental illness had led to violence. Roque further asserts that the judge erroneously struck Sylvia's statement as hearsay because it had the "circumstantial guarantees of trustworthiness" required for admission under Rule 803(24) of the Arizona Rules of Evidence. Roque also argues that the judge erred by telling the jury that the statement was "not reliable" because the judge thereby implied that Sylvia's testimony generally lacked reliability.

        *a.   Rule 803(24)*

¶62     Because Roque did not mention Rule 803(24) at trial in response to the prosecutor's hearsay objection, we review Roque's "circumstantial guarantee" argument only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (fundamental error standard applies if no objection made at trial). "To obtain relief under the fundamental error standard of review, [Roque] must first prove error." *Id.* at 568, ¶ 23, 115 P.3d at 608.

¶63     Rule 803(24) of the Arizona Rules of Evidence is an exception to the hearsay rule that allows the admission of

- 31 -

evidence that possesses "equivalent circumstantial guarantees of trustworthiness" to evidence admissible pursuant to the other hearsay exceptions. The offered statement must be "evidence of a material fact" that is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and its admission must serve the "interests of justice." Ariz. R. Evid. 803(24). A judge must consider the "spirit rather than the letter" of Rule 803(24), and "look at each case individually [to] determine the reliability of the particular evidence." *State v. Robles*, 135 Ariz. 92, 95, 659 P.2d 645, 648 (1983). Factors the judge should consider include the "presence of oath or cross-examination," the "ability of a declarant to perceive clearly," the "amount of time between event and declaration," any "corroboration," the "self-incriminatory nature of the declaration," whether the "declaration was unambiguous and explicit [or] contrary to [the declarant's] pecuniary interests," and whether there are "multiple levels of hearsay" involved. *Id.* (citing cases).

¶64    The judge did not err here in precluding Sylvia's statement. The statement allegedly made by Sylvia's grandmother was not made under oath or subject to cross-examination, and nothing in the record indicates that she made the statement near the time of the event in question. Nor is any other indicator

of reliability present. While Roque may be correct that a grandmother is *unlikely* to lie to her granddaughter about an attempt to hurt her, we cannot know whether Sylvia's grandmother ever made the statement, let alone whether Sylvia offered it truthfully or accurately. The trial judge did not err in concluding that the statement does not exhibit the reliability necessary to qualify as an exception to the hearsay rule.

> b. *Explaining the Legal Reasoning to the Jury*

¶65 Roque did not object when the judge explained to the jury that he struck Sylvia's hearsay statement "as not being reliable," so we review the comment only for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. Error is fundamental if it "go[es] to the foundation of the case, . . . takes from the defendant a right essential to [defendant's] defense, and [is] of such magnitude that the defendant could not possibly have received a fair trial." *Id.* (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)). We reverse only if the error actually prejudiced the defendant. *Id.* ¶ 20.

¶66 Historically, judges were permitted to comment on the general weight of evidence to assist the jury in reaching its verdicts. 9 WIGMORE ON EVIDENCE § 2551 (1981). In Arizona, however, the constitution prohibits judges from commenting on the evidence. Ariz. Const. art. 6, § 27. To violate this

prohibition, "the court must express an opinion as to what the evidence proves" or "interfere with the jury's independent evaluation of that evidence." *State v. Rodriguez*, 192 Ariz. 58, 63, ¶ 29, 961 P.2d 1006, 1011 (1998) (citations omitted).

¶67    Roque asserts that the judge's comment on the reliability of Sylvia's statement was "implied vouching" and suggests that "there is a reasonable likelihood that at least one of the jurors considered this implied vouching in deciding if other parts of Sylvia's testimony were true." This, Roque maintains, constitutes judicial interference with the jury's independent evaluation of the evidence.

¶68    We agree that the judge should not imply that a witness's testimony is unreliable. *State v. Philpot*, 66 N.W. 730, 732 (Iowa 1896) (noting that "it is a matter of common knowledge that jurors hang tenaciously upon remarks made by the court during the progress of the trial"). But while the trial judge would have been better advised simply to sustain the motion to strike without explaining his reasoning, we do not believe that his comments can be taken as relating to anything but the stricken testimony. Moreover, were we to assume that the judge's explanation regarding one statement was a comment regarding the reliability of Sylvia's testimony generally, any error would not be fundamental, as Sylvia's other statements did little to establish that Roque was mentally ill at the time of

- 34 -

the commission of his crimes. The judge's explanation therefore was not of such magnitude that Roque could not have received a fair trial.

### 4. Right to Confront Source of Testimonial Statements

¶69 During the videotaped interrogation of Roque after the shootings, the police detectives told Roque that his wife, Dawn, had made statements to them incriminating Roque. Dawn refused to testify at trial. Roque asserts that the admission of the videos at trial violated the Sixth Amendment's Confrontation Clause as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004), because the detectives used Dawn's statements in questioning Roque and Roque had no opportunity to cross-examine Dawn.

¶70 The trial court's admission of the videos did not violate the Confrontation Clause. *Crawford* establishes that the Sixth Amendment right to confront witnesses attaches to testimonial witness statements made to a government officer to establish some fact. *See* 541 U.S. at 68. In this case, however, there was no evidence presented that Dawn actually made the statements that the detectives used in questioning Roque. The detectives' report of what Dawn said was not being offered at trial for the truth of the matters allegedly asserted by Dawn and therefore did not constitute hearsay. Instead, the detectives were using an interrogation technique to elicit a

confession from Roque. The judge instructed the jury, in watching the interrogation videos, not to consider the detectives' statements for their truth. Because the statements allegedly made by Dawn were never introduced for their truth, they were not testimonial hearsay statements barred by the Confrontation Clause. *See id.* at 59 n.9. The admission of the videotaped statements therefore did not violate Roque's rights under the Confrontation Clause.

## C. Jury Instructions in the Guilt Proceeding

### 1. Adequacy of Guilty Except Insane Instructions

¶71 At trial, Roque claimed that before the shootings, he heard God's voice instructing him to "kill the devils." Roque now argues that the jury should have been instructed to consider whether his belief that he was commanded by God to kill negated any understanding that his acts were "wrongful" under Arizona's insanity statute, A.R.S. § 13-502 (2001). Specifically, Roque argues that the jury should have been instructed that (1) the statutory definition of insanity encompasses both moral wrongfulness and legal wrongfulness; (2) the definition of insanity includes the first prong of the *M'Naghten* test — that the defendant has no knowledge of the nature and quality of the act; and (3) mental illness may negate the element of mens rea. The judge actually instructed the jury, pursuant to statutory terms, that a "person is guilty except insane if at the time of

- 36 -

the commission of the criminal act, the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong."

¶72     The insanity instruction given in Roque's trial, which reflected the language of A.R.S. § 13-502, consists of a portion of the *M'Naghten* test for insanity.  *See Clark v. Arizona*, ___ U.S. ___, ___, 126 S. Ct. 2709, 2718 (2006).  The complete *M'Naghten* test states that a person is not responsible for criminal conduct by reason of insanity if, at the time of the conduct, (1) the person was suffering from a mental disease or defect so as not to know the nature and quality of the act, or (2) the person did not know that what he was doing was wrong. *Id.* at 2719; *see also State* v. *Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997).  Arizona's definition encompasses only the second prong.  *Clark*, 126 S. Ct. at 2718; *see also* A.R.S. § 13-502(A).   In *Clark*, the Supreme Court held that Arizona's definition of insanity does not deny a defendant due process. 126 S. Ct. at 2724.  The Court also concluded that due process does not require that a jury determine whether mental illness negates mens rea.  *Id.* at 2737; *see also Mott*, 187 Ariz. at 541, 931 P.2d at 1051.  Accordingly, in this case, the trial court did not err in instructing the jury regarding a guilty except insane verdict.

2. <u>Definition of "Clear and Convincing"</u>

¶73 The trial court instructed the jury that, for a verdict of guilty except insane, it must find that Roque proved by clear and convincing evidence that he was legally insane at the time of the commission of the crimes. *See* A.R.S. § 13-502(C). The court defined "clear and convincing" as "highly probable," and added that "[t]his is a lesser standard of proof than beyond a reasonable doubt." By contrast, the court defined "[p]roof beyond a reasonable doubt" as "proof that leaves you firmly convinced of the defendant's guilt."

¶74 Roque asserts that the trial court erred in defining "clear and convincing" because the "highly probable" instruction with respect to clear and convincing evidence is indistinguishable from the "firmly convinced" instruction given with respect to proof beyond a reasonable doubt. Roque did not object at trial, so we review only for fundamental error. *See* *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶75 This court has adopted the definition of "clear and convincing" that requires the jury to "be persuaded that the truth of the contention is 'highly probable.'" *In re Neville*, 147 Ariz. 106, 111, 708 P.2d 1297, 1302 (1985) (quoting MCCORMICK ON EVIDENCE § 340(b) (2d ed. 1972)). Moreover, we have repeatedly stated that jury instructions must be considered as a whole. *E.g.*, *State v. Schrock*, 149 Ariz. 433, 440, 719 P.2d

1049, 1056 (1986). In this case, the jury instructions complied with precedent in defining clear and convincing as "highly probable." The judge also instructed that the clear and convincing standard is lower than the beyond a reasonable doubt standard of proof, thereby establishing the relative positions of the standards.

¶76 Roque cites *State v. Renforth*, 155 Ariz. 385, 746 P.2d 1315 (App. 1987), for the proposition that erroneous jury instructions constitute fundamental error. But *Renforth* stated that the proper definition of "clear and convincing" is "highly probable," precisely as it was defined here, and found problems only with the use of the terms "unambiguous" and "certain" in the jury instructions. *Id.* at 388, 746 P.3d at 1318. This court and others have cited *Renforth* with approval. *See United States v. Owens*, 854 F.2d 432, 436 n.8 (11th Cir. 1988); *State v. King*, 158 Ariz. 419, 422-23, 763 P.2d 239, 242-43 (1988). Because the instruction at issue used the approved term "highly probable" and correctly advised the jury that clear and convincing is a lower standard than proof beyond a reasonable doubt, there was no error in these jury instructions.

3. Constitutionality of Burden of Persuasion for Insanity

¶77 Roque claims that placing the burden on a defendant to prove insanity by clear and convincing evidence, as required by A.R.S. § 13-502(C), violates due process. We considered and

- 39 -

rejected this claim in *State v. Moorman*, 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987). In that case, we observed that the Supreme Court has upheld imposing on a defendant "the burden of proving insanity beyond a reasonable doubt." *Id.* (citing *Leland v. Oregon*, 343 U.S. 790, 798 (1952)). If the requirement of proof beyond a reasonable doubt is not unconstitutionally high, neither is the requirement that a defendant prove insanity by clear and convincing evidence.

**D.   Aggravation Phase Issues**

   1.   State's Cross-Appeal:  Dismissal of (F)(2) Aggravating Factor

**¶78**      Just before trial, the State filed an amended notice of aggravating circumstances listing a 1983 California conviction for attempted robbery as a qualifying prior serious offense under A.R.S. § 13-703(F)(2). Concluding that the California conviction did not qualify as a serious offense under Arizona law, the judge granted a defense motion in limine. After trial, the State filed a cross-appeal asserting that the trial court erred in dismissing the (F)(2) aggravating factor. *See* A.R.S. § 13-4032(3) (2001).

**¶79**      We elect to decide the cross-appeal because it "presents a question of statutory interpretation of general applicability in death penalty cases that we believe needs to be resolved." *State v. Romanosky*, 162 Ariz. 217, 227, 782 P.2d

- 40 -

693, 703 (1989). Its resolution also bears on our independent review under A.R.S. § 13-703.04 (Supp. 2003). We review this question of law de novo. *Moody*, 208 Ariz. at 445, ¶ 62, 94 P.3d at 1140.

¶80 Section 13-703(F)(2) provides that "[t]he trier of fact shall consider," as an aggravating factor in a capital case, that "[t]he defendant was previously convicted of a serious offense, whether preparatory or completed." Robbery qualifies as a serious offense when committed outside Arizona if the act would have constituted the offense of robbery if it had been committed in Arizona. A.R.S. § 13-703(H)(8).[7]

> a. *Statutory Comparison of Attempted Robbery*

¶81 When considering an offense committed in another state, "[t]he statutory definition of the prior crime, and not its specific factual basis, dictates whether an aggravating circumstance exists under A.R.S. § 13-703(F)(2)." *State v. Henry*, 176 Ariz. 569, 587, 863 P.2d 861, 879 (1993).[8] To protect "a criminal defendant's due process rights," a court "may not consider other evidence[] or bring in witnesses" to establish

---

[7] Section 13-703(H) was renumbered as § 13-703(I) in 2005.

[8] The case law cited here addresses the predecessor to the version of A.R.S. § 13-703(F)(2) applicable in this case, which read: "The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." The rationale in those cases applies to both versions of the statute.

the offense. *State v. Schaaf*, 169 Ariz. 323, 333-34, 819 P.2d 909, 919-20 (1991). We "will not 'allow what is, in effect, a second trial on defendant's prior conviction to establish the existence of an A.R.S. § 13-703(F)(2) aggravating circumstance.'" *Id.* at 334, 819 P.2d at 920 (quoting *State v. Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983)).

¶82    The question is therefore whether, based on the statutory provisions, Roque's attempted robbery in California would have constituted an attempted robbery if it had been committed in Arizona. In Arizona,

> [a] person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property.

A.R.S. § 13-1902(A) (2001). "'Threat' means a verbal or physical menace of imminent physical injury to a person." A.R.S. § 13-1901(4) (2001). "'Force' means any physical act directed against a person as a means of gaining control of property." A.R.S. § 13-1901(1).

¶83    In California, "[r]obbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211 (West, Westlaw through 2006). "Fear" is defined as:

- 42 -

1.  *The fear of an unlawful injury to the* person or *property* of the person robbed, or of any relative of his or member of his family; or,
2.  *The fear of an immediate and unlawful injury to the* person or *property* of anyone in the company of the person robbed at the time of the robbery.

Cal. Penal Code § 212 (West, Westlaw through 2006) (emphases added).

¶84     A comparison of these robbery statutes makes it evident that one may attempt a robbery in California by acts that do not constitute an attempted robbery if committed in Arizona.  A robbery in Arizona requires either a threat — a menace of imminent injury to a person — or force — a physical act directed against a person.  A.R.S. §§ 13-1902(A) & -1901(1), (4).  By contrast, one may attempt robbery in California by creating a fear of injury to the *property* of the person robbed or anyone in his company.  Cal. Penal Code §§ 211-12.  Thus, on the face of the statutes, one who attempts to take property from a victim by means of fear of injury to the victim's property may be convicted of attempted robbery in California, but not in Arizona.

¶85     In addition, the imminent nature of a threat of physical injury to the victim contained in the Arizona robbery statute is missing from the California statute.  *Compare* A.R.S. § 13-1901(4) *with* Cal. Penal Code § 212.  In Arizona, a verbal threat includes only a "menace of *imminent* physical injury."

A.R.S. § 13-1901(4). Thus, if one attempts a robbery by saying, "Give me your money or I'll shoot you next year," one may again be convicted of attempted robbery under California's statutory language, but not under Arizona's.

¶86 Accordingly, the California and Arizona robbery statutes are not coterminous. The trial judge therefore did not err in concluding that acts constituting attempted robbery under California law do not necessarily constitute an attempted robbery under Arizona law. The California attempted robbery does not qualify as a "serious offense" aggravating factor under (F)(2).

b. *Consideration of the 1983 Complaint*

¶87 In contravention of the rule established in *Henry*, 176 Ariz. at 587, 863 P.2d at 879, and *Schaaf*, 169 Ariz. at 333-34, 819 P.2d at 919-20, the State asks us to look beyond the language of the statutes to the Complaint filed in the 1983 attempted robbery conviction. In a deviation from the statutory language defining robbery, the Complaint alleges that Roque attempted to take personal property by means of "force *and* fear" instead of "force *or* fear." Because force was included in that allegation, the State argues, Roque's conviction qualifies as attempted robbery in Arizona. The State therefore asks that we find the existence of the (F)(2) aggravating factor here.

¶88 The State cites *State v. Thompson*, for the proposition

that a sentencing court may rely on facts set forth in the information of a prior offense committed outside Arizona to find that the prior offense would constitute a felony in Arizona for purposes of sentence enhancement, if the information is incorporated by reference in the judgment of conviction. 186 Ariz. 529, 532-33, 924 P.2d 1048, 1051-52 (App. 1996). In *Thompson*, however, the court used the charge contained in the information only to narrow the foreign conviction to a particular subsection of the statute that served as the basis of the foreign conviction. *Id.* at 532, 924 P.2d at 1051. In this case, the State asks us to infer from the Complaint the factual nature of the prior conviction. We decline to do so. Because the acts constituting attempted robbery under California law do not necessarily constitute an attempted robbery under Arizona law, the trial court did not err in dismissing the (F)(2) aggravating factor based on Roque's 1983 attempted robbery conviction.

2.   Validity of (F)(3) Aggravating Factor

¶89     Roque argues that applying the A.R.S. § 13-703(F)(3) aggravating factor — knowingly creating a grave risk of death to Louis Ledesma while shooting Balbir Sodhi — renders him eligible for death when those of greater culpability would not be death eligible. Thus, he claims, the factor does not serve to appropriately narrow the class of persons eligible for the death

- 45 -

penalty, rendering it capricious and arbitrary. This claim raises a matter of statutory interpretation and constitutional law, which we review de novo. *State v. Christian*, 205 Ariz. 64, 66, ¶ 6, 66 P.3d 1241, 1243 (2003) (interpreting statutory provision); *Moody*, 208 Ariz. at 445, ¶ 62, 94 P.3d at 1140 (interpreting constitutional provision).

¶90 Roque bases his claim on our cases holding that the (F)(3) factor does not apply when the defendant creates a risk to an intended victim of the crime. *State v. Fierro*, 166 Ariz. 539, 550, 804 P.2d 72, 83 (1990); *State v. Tison*, 129 Ariz. 526, 542, 633 P.2d 335, 351 (1981). While an additional homicide may trigger the A.R.S. § 13-703(F)(8) aggravating factor (multiple homicides), a crime against an intended victim not resulting in death (attempted murder or assault, for example) does not trigger any aggravating factor.[9] *See State v. Gretzler*, 135 Ariz. 42, 57 & n.2, 659 P.2d 1, 16 & n.2 (1983) (confirming that crimes occurring in the same series of events do not trigger (F)(2), the prior serious offense aggravator). Thus, despite the fact that our criminal statutes generally penalize intentional acts more harshly than unintentional ones, Roque faces the death penalty precisely because he did *not* intend to

---

[9] Of course, that crime might warrant an additional sentence upon a conviction for attempted murder (or another offense), but the crime could not be used as an aggravating factor to render the defendant eligible for the death penalty.

harm Ledesma. This, Roque claims, violates the fundamental "precept of justice that punishment for crime should be graduated and proportioned to the offense." *Roper v. Simmons*, 543 U.S. 551, 560 (2005) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)); *accord Atkins v. Virginia*, 536 U.S. 304, 311 (2002). Roque contends that our statutes do not "permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers*, 497 U.S. 764, 776 (1990) (collecting cases).

¶91 We disagree with Roque's assertion that the (F)(3) aggravating factor does not rationally distinguish between a defendant who deserves the death penalty and one who does not. This court recently confirmed that the (F)(3) factor applies only if the defendant knowingly engaged in conduct that created a real and substantial risk of death to another person who, while not an intended target, was also not an unaffected bystander. *State v. Johnson*, 212 Ariz. 425, 438, ¶ 52, 133 P.2d 735, 748 (2006) (citing *State v. Wood*, 180 Ariz. 53, 69, 881 P.2d 1158, 1174 (1994)). The fact that the legislature has not also established an aggravating factor based on endangerment to an *intended* victim does not render the (F)(3) factor arbitrary or capricious. The (F)(3) factor still requires a defendant to have put a third party at grave risk of death in the commission of a murder, and, by distinguishing that act from murders in

which no third parties are endangered, the (F)(3) factor adequately narrows the class of defendants eligible for the death penalty.

¶92       Moreover, the jury instructions clarified the meaning of the (F)(3) factor.  The instructions given in Roque's case not only tracked the statutory language, but also informed the jury that the "mere presence of Ledesma near Mr. Sodhi during the shooting" was not enough to support the (F)(3) factor.  These instructions substantially reflected instructions requested by Roque.  With appropriate instructions such as those given here, the (F)(3) factor adequately channels the jurors' discretion to impose the death penalty.  Accordingly, we conclude that the (F)(3) aggravating factor is not unconstitutionally capricious or arbitrary.[10]

   3.   Sufficiency of Evidence of (F)(3) Aggravating Factor

¶93       Roque next claims that the State failed to prove the (F)(3) aggravating factor beyond a reasonable doubt.  In reviewing a sufficiency of the evidence claim, this court reviews the record to determine whether substantial evidence supports the jury's finding, viewing the facts in the light most

---

[10]    To the extent that Roque's argument can be construed as raising a proportionality argument, we note that the Fourteenth Amendment requires only appropriate narrowing of the class of offenders eligible for the death penalty.  *Lewis*, 497 U.S. at 776.  It does not require proportionality.

favorable to sustaining the jury verdict. *State v. Roseberry*, 210 Ariz. 360, 368-69, ¶ 45, 111 P.3d 402, 410-11 (2005). Substantial evidence is "such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *Id.* at 369, 111 P.3d at 411 (quoting *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990)).

¶94 The "grave risk of death" aggravating factor requires proof that a person who was not the intended victim was within the zone of danger created by the defendant's criminal acts. *Fierro*, 166 Ariz. at 550, 804 P.2d at 83. The "inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injury." *Wood*, 180 Ariz. at 69, 881 P.2d at 1174. For example, we have upheld the (F)(3) aggravating factor when the defendant shot a gun in a crowded area, *State v. McMurtrey*, 151 Ariz. 105, 108, 726 P.2d 202, 205 (1986), or when another person was in the line of fire, *Fierro*, 166 Ariz. at 550, 804 P.2d at 83. Threatening others with a gun during the altercation that ultimately caused the murder victim's death may also trigger the aggravating factor. *Wood*, 180 Ariz. at 69-70, 881 P.2d at 1174-75; *State v. Nash*, 143 Ariz. 392, 405, 694 P.2d 222, 235 (1985).

¶95 On the other hand, a focused assault on a particular

target may not trigger the (F)(3) aggravating factor, even if others are nearby. In *State v. Smith*, for example, the defendant shot a convenience store clerk to get the money in the cash register. 146 Ariz. 491, 502, 707 P.2d 289, 300 (1985). Although other customers were in the store, we concluded that the prosecution failed to prove the (F)(3) factor because the shooting of the clerk "was not random and indiscriminate, but purposeful." *Id.* The situation thus differed from those in *McMurtrey* and *Fierro*, in which the defendants' actions "only fortuitously failed to cause another person's death." *Id.*

¶96      Although Roque's acts could be argued to be a targeted assault like that in *Smith*, substantial evidence supports the jury's conclusion that Ledesma was within the zone of danger and could have been killed during the assault on Sodhi. Roque fired five or six shots toward Sodhi and Ledesma from a distance of approximately twenty feet. Ledesma was not in the direct line of fire, but reported being within two feet of Sodhi and hearing bullets whizzing over his shoulders. Had Roque not been an accurate shot, Ledesma could have been hit or killed. Because substantial evidence supports the jury's finding of the (F)(3) aggravating factor, we affirm that verdict.

    4.   <u>Use of Facts for Both (F)(3) Aggravating Factor and Reckless Endangerment Charge</u>

¶97      For shooting Sodhi while Ledesma knelt near him, the

jury convicted Roque of endangering Ledesma. *See* A.R.S. § 13-1201 (2001). Roque now claims that the "same act or transaction" served as a basis for both the conviction of endangerment and the establishment of the (F)(3) aggravating factor. Roque maintains that this constitutes impermissible "double counting." *See State v. Rutledge*, 206 Ariz. 172, 178, ¶ 25, 76 P.3d 443, 449 (2003). We review de novo this question of statutory interpretation. *Christian*, 205 Ariz. at 66, ¶ 6, 66 P.3d at 1243.

**¶98** The language of the pre-2003 version of the (F)(2) "prior serious offense" aggravating factor applicable to Roque's case precludes us from considering a conviction arising out of the same series of events as the murder to be a previous conviction.[11] *Rutledge*, 206 Ariz. at 178, ¶ 25, 76 P.3d at 449. But *Rutledge* does not speak to the use of *facts underlying* a simultaneous conviction for other aggravating factors, such as (F)(3) or (F)(8). Roque's position that *Rutledge* creates a blanket rule against the use of simultaneous convictions or underlying facts is rebutted by the plain language of the (F)(8) aggravating factor, which expressly permits consideration of

---

[11]   In 2003, after Roque committed his crimes, the legislature revised (F)(2) to add the following:  "Convictions for serious offenses committed on the same occasion as the homicide, or not committed on the same occasion but consolidated for trial with the homicide, shall be treated as a serious offense under this paragraph."  2003 Ariz. Sess. Laws, ch. 255, § 1.

homicides "committed during the commission of the offense" to render a defendant eligible for the death penalty. Likewise, nothing in the language of the (F)(3) aggravating factor indicates the legislature's intent to prohibit the use of facts underlying an endangerment conviction arising from the same series of events as the murder to help establish the "grave risk of death to another person."

¶99 Furthermore, the (F)(3) aggravating factor requires proof of more than just the endangerment conviction. While endangerment requires a mental state of recklessness and the creation of a risk of physical injury, A.R.S. § 13-1201, the (F)(3) factor requires a mental state of *knowing* and the creation of a grave risk of *death*. Thus the crime of endangerment by itself does not satisfy the (F)(3) aggravating factor. Roque's "double counting" claim therefore fails.

### 5. Norm of First Degree Murders

¶100 Roque claims that this murder was not so beyond the norm of first degree murders as to deserve the death penalty, and he asks this court to overturn his death sentence because his crime is no worse than the crimes of other defendants who have received life sentences. Although this court did at one time engage in proportionality reviews, we no longer do so. *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). We instead independently review the aggravating and mitigating

factors to assess the propriety of the death sentence.  A.R.S. § 13-703.04; *see infra* ¶¶ 166-70.

### 6. Lack of Aggravating Factors in Indictment

¶101    Roque contends that the State's failure to allege the aggravating factors specified in A.R.S. § 13-703(F) in the indictment constitutes fundamental error.  We considered and rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 100 P.3d 18 (2004).

### 7. Refusal to Replace Juror who had been Approached by the Media

¶102    Roque claims that the trial judge abused his discretion in not replacing a juror with an alternate after a movie producer handed the juror a business card.  We review for abuse of discretion, *see Glassel*, 211 Ariz. at 47, ¶ 46, 116 P.3d at 1207, deferring to the trial judge's superior opportunity to assess the juror's demeanor and credibility, *see Wainwright*, 469 U.S. at 428-29; *accord Glassel*, 211 Ariz. at 48, ¶ 50, 116 P.3d at 1208.

¶103    "In a criminal case, any private communication, contact or tampering[,] directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  *State v. Miller*, 178 Ariz. 555, 558-59, 875 P.2d 788, 791-92 (1994) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

But the "presumption is rebuttable, and the burden rests with the government to show that the third party communication did not taint the verdict." *Id.* at 559, 875 P.2d at 792.

¶104    In this case, while the movie producer's contact with the juror was presumptively prejudicial, the judge properly heard testimony from the producer and the juror to determine whether the juror could still render a fair and impartial decision.  The hearing revealed that, when the producer handed the business card to the juror, the juror simply put it in his pocket.  He said nothing to the producer and was unsure of the producer's profession.  The juror stated unequivocally that the producer's contact would not affect his ability to fairly and impartially decide the case.  The judge concluded that the State had met its burden of overcoming the presumption of prejudice. On this record, we cannot conclude that the judge abused his discretion in allowing the juror to remain on the panel.

**E.    Evidentiary Rulings during the Penalty Phase**

    1.    Relevance of State's Rebuttal Evidence

¶105    Roque disputes the admission of four pieces of evidence during the penalty phase of his trial:  (1) the 1983 attempted robbery conviction; (2) the conviction for the attempted murder of Anwar Khalil; (3) a history of domestic violence; and (4) a history of racism.  We "give deference to the trial court's decision as to the relevance of evidence

offered pursuant to section 13-703.C" in the penalty phase. *State v. McGill*, ___ Ariz. ___, ___, ¶ 40, ___ P.3d ___, ___ (2006).

¶106    In the penalty phase, the defendant has the burden to prove the existence of mitigating circumstances by a preponderance of the evidence, and the state may rebut the defendant's mitigating evidence.    A.R.S. § 13-703(C), (D). "[T]he prosecution or the defendant may present any information that is relevant to any of the mitigating circumstances . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials."   A.R.S. § 13-703(C). In addition, "the state may present any evidence that demonstrates that the defendant should not be shown leniency." A.R.S. § 13-703.01(G) (Supp. 2003).

¶107    Roque contends that the judge erred in admitting much of the State's rebuttal evidence because it was irrelevant, unfairly prejudicial, or hearsay.   But A.R.S. § 13-703(C) provides that rebuttal evidence is admissible if relevant, without regard to its admissibility under the rules of evidence. Within constitutional limits, the sole inquiry is therefore whether the evidence the State offered was relevant to rebut Roque's mitigating evidence.   Relevance for this purpose is defined as "evidence tending to prove or disprove the matter at issue," a standard virtually identical to that employed in Rule

401 of the Arizona Rules of Evidence. *See McGill*, ___ Ariz. at ___, ¶ 40, ___ P.3d at ___ (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1051 (11th ed. 2003)).

### a. 1983 Attempted Robbery Conviction

¶108    The defense called only one witness, Dr. Jack Potts, to offer mitigating evidence in the penalty phase. On direct examination, Dr. Potts said, "[Roque's] lack of prior violence . . . like the shootings, clearly argues against this occurring again." On cross-examination, the prosecutor asked Dr. Potts if he was aware of Roque's 1983 attempted robbery conviction. The judge overruled the defense's relevance objection.

¶109    Roque's prior conviction was relevant to rebut Dr. Potts' assertion that Roque did not have a history of violence and did not pose a threat. The threshold for relevance is a low one, and the evidence did tend to prove a matter at issue. *See id.* The judge therefore did not err in allowing the jury to hear that evidence.

### b. Conviction for Attempted Murder of Khalil

¶110    Roque also argues that the judge improperly authorized the jury to consider the attempted murder of Khalil as rebuttal to the mitigating evidence. But A.R.S. § 13-703.01(G) provides that the state may introduce any evidence demonstrating that a defendant should not be shown leniency. We have held that the

jury's assessment of mitigation "must be made in light of the facts of each case." *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 472, ¶ 17, 123 P.3d 662, 666 (2005). Roque's attempt to murder Khalil was a fact of the case relevant to the jury's assessment of whether Roque should be shown leniency. The trial court did not err in permitting the jury to consider this fact of the case.

### c. History of Racism

¶111 In cross-examining Dr. Potts, the prosecutor asked him whether, instead of mental illness, Roque's alleged racism could explain his crimes. Roque now argues that this was irrelevant to the mitigating evidence. But Roque's alleged racist behavior was relevant to rebut Dr. Potts' assertion that Roque suffered from a mental illness that caused him to commit the crimes. Testimony regarding Roque's alleged mental illness was the thrust of the mitigating evidence offered by the defense. Because the testimony regarding racism was relevant to rebut asserted mitigation evidence, the judge did not err in allowing that testimony.

### d. History of Domestic Violence

¶112 Roque also challenges the admission of evidence that he committed acts of domestic violence. A history of domestic violence was relevant to rebut Dr. Potts' assertion that Roque did not have a history of violence and thus did not pose a

threat to the public. *See State v. Lavers*, 168 Ariz. 376, 395, 814 P.2d 333, 352 (1991). The judge therefore did not err in allowing the jury to hear that evidence.

## 2. Admissibility of Victim Impact Statements

¶113 Roque contends that the victim impact statements were irrelevant and inadmissible under *Blakely v. Washington*, 542 U.S. 296 (2004), *Crawford*, 541 U.S. at 36, and the Arizona Constitution. Because he did not object on any of these grounds at trial, however, we review only for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶114 Victim impact evidence that focuses on the effect of the crime on the victim and the victim's family is relevant and admissible in the penalty phase of a capital trial to show the harm caused by the defendant's conduct. *State v. Roscoe*, 184 Ariz. 484, 502, 910 P.2d 635, 653 (1996). Its admission does not violate the Eighth Amendment. *Lynn v. Reinstein*, 205 Ariz. 186, 191, ¶ 16, 68 P.2d 412, 417 (2003) (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)). Because the victims here testified regarding the impact of Mr. Sodhi's death on their families, Roque's relevance argument fails.

¶115 His other arguments are equally unavailing. Because the victim impact statements neither were aggravating factors nor acted to increase Roque's sentence, his *Blakely* claim fails. *Crawford* is also inapposite. Because the victims made their

statements in court and stood subject to cross-examination, no confrontation issues arose. *See Crawford*, 541 U.S. at 68.

¶116     Finally, Roque asks this court to diverge from *Payne* and our precedents to find the use of victim impact statements fundamentally unfair in the imposition of the death penalty and therefore violative of the Arizona Constitution. But as the Supreme Court observed in *Payne*, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." 501 U.S. at 825. Roque provides no compelling argument for us to stray from our prior course. We therefore decline to do so.

### 3.     Exclusion of Mitigating Evidence

¶117     Roque argues that the judge improperly excluded a portion of a letter from his sister, Sylvia, who was unable to testify during the penalty phase of the trial. Because Roque raised this argument at trial, we review the judge's evidentiary ruling for an abuse of discretion. *See Aguilar*, 209 Ariz. at 49, ¶ 29, 97 P.3d at 874. To warrant reversal, any error must also have prejudiced Roque. *Salazar*, 173 Ariz. at 405, 844 P.2d at 572.

¶118     Roque first contends that the trial judge abused his discretion in excluding a statement in Sylvia's letter that the

"tragedy was not fueled by hate." This statement, he argues, was relevant because it implied that mental illness, not racism, caused Roque's crimes. Even assuming arguendo that the judge abused his discretion in excluding this statement, Roque suffered no prejudice. The admitted portion of Sylvia's letter explained Roque's mental illness. Because the redacted statement reiterated a point already made in the admitted portion, any error in excluding the statement was harmless.

¶119 Roque also contends that the trial judge improperly excluded the section of Sylvia's letter addressing the suffering of Roque's family. We have held that a sister's testimony expressing concern for the defendant's family's well-being is "altogether unrelated to defendant, to his character, or to the circumstance of the offense" and is therefore not relevant mitigating evidence. *Williams*, 183 Ariz. at 385, 904 P.2d at 454. Accordingly, the judge did not abuse his discretion in excluding Sylvia's statements about the suffering of Roque's family.

¶120 To the extent that Sylvia's letter asked the jury to impose a "compassionate" sentence, that portion of the letter was also properly excluded. We have held that "[v]ictims' recommendations to the jury regarding the appropriate sentence a capital defendant should receive are not constitutionally relevant." *Lynn*, 205 Ariz. at 191, ¶ 17, 68 P.3d at 417. If

such recommendations from the victim and victim's family are not relevant, neither are they from the defendant's family.

### 4. Exclusion of Expert's Statement

¶121 During the State's cross-examination of Dr. Potts, the following exchange took place:

> [State]: And you're saying that [psychiatry] is a science as opposed to an art?
> [Potts]: It's both. Just like all medicine should be, it's both.
> [State]: And you can be wrong, correct?
> [Potts]: Of course, I can be wrong.
> [State]: And you might be wrong in this case?
> [Potts]: And I might have been wrong on the insanity issue, too . . . .

In response to the State's motion, the court struck the final statement as non-responsive. Roque now challenges that ruling. Because he did not challenge the court's ruling at trial, however, we review only for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶122 Because the prosecutor asked Dr. Potts whether he might be wrong "in this case," as opposed to "in the penalty phase of the trial," the answer was in fact responsive to the question asked, though perhaps not to the question intended. But it matters little whether the judge's ruling was correct because, for two reasons, Roque cannot establish that any error was fundamental. First, Dr. Potts' statement addressed whether he might have erred in concluding that Roque was not legally insane at the time of the offense, which was not at issue in the

penalty phase of the trial. The defense had the opportunity to offer all of Dr. Potts' testimony regarding his assessment of Roque's mental illness as mitigating evidence, which was at issue in the penalty phase, and the jury had heard such evidence in the guilt phase of the case. Second, the judge's striking of this one statement, even if error, did not go to the foundation of the case. We therefore conclude that any error was not fundamental.

## F.    State's Arguments during the Penalty Phase

### 1.    Mitigating Evidence as an "Excuse" for Conduct

¶123    Citing *Brown v. Payton* (*Brown II*), 544 U.S. 133 (2005), and *Tennard v. Dretke*, 542 U.S. 274 (2004), Roque contends that the following comments made by the prosecutor improperly narrowed the jury's consideration of mitigating evidence:

> Ask yourselves if [Roque's] low IQ affected his life.
> Did his low IQ cause this murder?  No.
>
> Does [Roque's family history of mental illness] excuse
> his conduct?  Is that why he killed Mr. Sodhi, because
> of his mother's illness?  Of course not.

The judge overruled the defense objection to these statements on the ground that the legal standard for consideration of mitigating evidence would be explained to the jury in the final jury instructions. We review for abuse of discretion. *See Aguilar*, 209 Ariz. at 49, ¶ 29, 97 P.3d at 874.

¶124    The Supreme Court has held it improper to require that evidence of a defendant's low IQ score bear a nexus to the crime or show a "uniquely severe permanent handicap with which the defendant was burdened through no fault of his own" to be considered in mitigation. *Tennard*, 542 U.S. at 283, 289. Instead, the Court said that mitigating evidence should be evaluated in the "most expansive terms." *Id.* at 284. In *Tennard*, the prosecutor had argued that the defendant's low IQ score was irrelevant to the mitigation because the defendant's low intelligence did not cause him to commit the crime. *See id.* at 278. The Court concluded that, in light of the prosecutor's statements, the jury instructions given had been insufficient to direct the jury to consider and give effect to all relevant mitigating evidence, including the defendant's low IQ. *See id.* at 288-89.

¶125    In *Brown II*, the Supreme Court considered whether a prosecutor's argument misled the jury to believe that it could not consider the defendant's mitigating evidence. 544 U.S. at 135-36. The prosecutor told the jurors that the defendant had not actually produced any mitigating evidence and that, in any event, they should not consider any mitigation that concerned post-crime conduct by the defendant. *Id.* at 144. The jury instruction given in *Brown II*, however, directed jurors to consider "[a]ny other circumstance which extenuates the gravity

of the crime even though it is not a legal excuse for the crime." *Id.* at 137 (quoting Cal. Penal Code § 190.3 (1988)). The instructions directed the jury, in evaluating mitigation, to consider all of the evidence presented "during any part of the trial in this case." *Id.* While the Court recognized that the trial judge could have done more to advise the jury of the law, it concluded that "[t]he jury was not left without any judicial direction," *id.* at 146, and that the jury was adequately instructed as to mitigation, *id.* at 147.

¶126 Likewise, the instructions in Roque's trial properly instructed the jury to consider in mitigation "anything offered by the defense or the State before or during this phase of the trial." Roque takes issue with the prosecutor's arguments that mitigation should "excuse" the crime, contending that these arguments violated *Tennard* by requiring a nexus between mitigating evidence and the crime. But the jury instructions served to cure any such implication by directing the jury to consider "anything" as mitigation and by specifically enumerating twelve mitigating factors, including low IQ and a family history of mental illness. As in *Brown II*, the instructions adequately informed the jurors that they were to consider any mitigating circumstance about Roque that might warrant the imposition of a sentence less than death. The trial judge therefore did not abuse his discretion in allowing the

prosecutor's arguments here.

2. Use of the Phrase "Under the Guise of Our Flag and Patriotism"

¶127    Roque asserts that the following statement by the prosecutor impermissibly encouraged the jury to impose death based on passion and patriotism:

> But what this country does with regard to the decisions that this country makes, the decisions that the criminal justice system makes, with respect to the kind of crimes that this defendant committed, under the guise of our flag and patriotism, will — speaks volumes about us.

Because Roque did not object to those statements at trial, we review only for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶128    In evaluating the propriety of a prosecutor's argument, this court analyzes whether the remarks called to the jurors' attention matters that they should not consider, and whether, "under the circumstances of the particular case, [the remarks] probably influenced" the jurors. *Sullivan v. State*, 47 Ariz. 224, 238, 55 P.2d 312, 317 (1936); *see also State v. Hansen*, 156 Ariz. 291, 297, 751 P.2d 951, 957 (1988).

¶129    Roque committed his crimes in response to the terrorist attacks of September 11, 2001, and he targeted people he thought to be of Arab descent.   When arrested, Roque immediately stated, "I'm a patriot and American.   I'm American. I'm a damn American."   In this respect, the prosecutor's

- 65 -

comments simply referred to the circumstances of Roque's crimes and responded to a theme the defense introduced.

¶130      In *State v. Hansen*, we observed that "the trial court is in a better position to judge whether the prosecutor is unduly sarcastic, his tone of voice[] [and] facial expressions, and [to ascertain] their effect on the jury, if any."  156 Ariz. at 297, 751 P.2d at 957.  Because Roque's counsel did not object, the trial judge had no opportunity to determine whether the prosecutor's comment constituted error and, if so, whether the error was prejudicial.  Nor did the judge have the opportunity to redress any error by instructions to the jury.  Moreover, the jurors had already heard evidence that Roque's crimes were motivated by patriotism and committed in reaction to terrorist attacks on American soil.  Under a fundamental error analysis, the prosecutor's comment was not of such magnitude that it deprived the defendant of a fair trial.  *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607 (defining fundamental error).

### 3.    Comparison of Defendant and Victim

¶131      Roque asserts that the following comments by the prosecutor improperly compared the value of Roque's life to that of the murder victim:

> Defendant worked numerous years in the American aircraft industry.  That's true.  That's true.  Balbir Singh Sodhi worked a number of years in this country

driving a cab [and] working behind the counter of a store. The defendant is married. Balbir Singh Sodhi was married.

Because Roque moved for a mistrial, we review for an abuse of discretion, recognizing that "[t]he trial court is in the best position to determine whether an attorney's remarks require a mistrial." *Hansen*, 156 Ariz. at 297, 751 P.2d at 957. We also recognize that the declaration of a mistrial is the most dramatic remedy for a trial error and should be granted only if the interests of justice will be thwarted otherwise. *Moody*, 208 Ariz. at 456, ¶ 126, 94 P.3d at 1151 (citation omitted).

¶132    When the Supreme Court removed the bar to admission of victims' statements, the point was not to permit "a jury to find that defendants whose victims were assets to their communities are more deserving of punishment than those whose victims are perceived to be less worthy," *Payne*, 501 U.S. at 823, or to permit a comparison of the lives of the victim and the defendant.    A statement from a victim "is not offered to encourage comparative judgments of this kind . . . [but] is designed to show instead *each* victim's 'uniqueness as an individual human being.'"    *Id.* at 823.    Because the jury may consider victims' statements in making its sentencing decision, the prosecutor may discuss them in his closing argument. *See State v. Prince*, 204 Ariz. 156, 161, ¶ 23, 61 P.3d 450, 455 (2003).

¶133     We need not decide whether a prosecutor's statement comparing the value of the life of the defendant with that of the victim is proper because in this case the prosecutor stopped before making a value argument.  He summarized evidence that both Roque and Sodhi worked and were married.  This was a comparison of the two, but not a valuation of the two.  The prosecutor did not continue the comparison after the defense objected, and the judge properly and immediately instructed the jury on the law.  Because the prosecutor's comments did not call the jury's attention to a matter it could not consider, there was no error.

**G.    Jury Instructions in the Penalty Phase**

    1.    Influence of "Sympathy or Prejudice"

¶134     Roque contends that the instruction to the jurors that they "should not be influenced by sympathy or prejudice," in combination with the prosecutor's arguments, impermissibly limited the jury's consideration of mitigating evidence. Because Roque did not object at trial, we review only for fundamental error.  *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶135     We approved the "sympathy" instruction in *State v. Carreon*, explaining that it promotes "reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a

'reasoned *moral* response' rather than an emotional one." 210 Ariz. 54, 71, ¶ 86, 107 P.3d 900, 917 (2005) (quoting *Saffle v. Parks*, 494 U.S. 484, 493 (1990)). The trial court thus did not err in its jury instruction on the proper role of sympathy.

   2. "Significant" Impairment and "Substantial" Duress as Mitigating Evidence

¶136    Roque submitted to the trial court a list of mitigating circumstances to be included in the jury instructions, one of which was a reference to A.R.S. § 13-703(G)(1), and the court gave an instruction tracking the language of that statute. The instruction provided, as a mitigating circumstance for the jury to consider, that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was *significantly* impaired, but not so impaired as to constitute a defense to prosecution." Jury Instruction (emphasis added) (quoting A.R.S. § 13-703(G)(1)). Roque also requested by reference an instruction that was based upon the language of A.R.S. § 13-703(G)(2), and that instruction was given. That instruction allowed the jurors to consider as a mitigating circumstance, that "the defendant was under unusual and *substantial* duress, although not such as to constitute a defense to prosecution." Jury Instruction (emphasis added) (quoting A.R.S. § 13-703(G)(2)).

¶137    Roque now asserts that the jury instructions failed to direct the jury to consider the non-statutory mitigating evidence of "simple" (as opposed to significant) impairment and "simple" (as opposed to substantial) duress.  But Roque requested the instructions given, and therefore "invited any error and waived his right to challenge the instruction[s] on appeal."  *Roseberry*, 210 Ariz. at 369, ¶ 53, 111 P.3d at 411.  Moreover, the jury was properly instructed to consider all non-statutory mitigating evidence.

### 3.    Lack of Burdens of Proof

¶138    Citing *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002), Roque contends that the court erred in failing to instruct the jury regarding the burden of proof for weighing mitigation and aggravation.  Roque further asserts that failing to instruct the jury on a burden of proof regarding the State's rebuttal to mitigation facilitated the State's impermissible "end run" around *Ring II*'s requirement that the jury find aggravating factors beyond a reasonable doubt, because the State's rebuttal to mitigation acted, in effect, to aggravate Roque's sentence.  Roque asks us to determine whether the jury instructions correctly stated the law, a question we review de novo.  *Glassel*, 211 Ariz. at 53, ¶ 74, 116 P.3d at 1213.

¶139    Under Arizona's capital sentencing statutes, neither party bears a burden of proof as to weighing aggravation and

mitigation in the penalty phase of a capital trial.  *Granville*, 211 Ariz. at 472, ¶ 17, 123 P.3d at 666.  "[W]hether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist."  *Id.* at 473, ¶ 21, 123 P.3d at 667.  In Roque's case, the trial judge properly refrained from assigning a burden of proof to the "juror's assessment of the quality and significance of the mitigating evidence."  *Id.*

¶140    Moreover, the jury instructions did not provide the State an "end run" around the *Ring II* requirement that it prove aggravating factors to a jury beyond a reasonable doubt.  The State had already proven the (F)(3) aggravating factor to the jury beyond a reasonable doubt in the aggravation phase of the trial, which made Roque "death eligible."  *See id.* at 472, ¶ 17, 123 P.3d at 666.  In the penalty phase of the trial, the State was permitted to present any relevant information to rebut the mitigating evidence presented by the defendant to help the jurors assess the quality of the mitigating evidence in deciding whether to impose the death penalty.  A.R.S. § 13-703(C).  Therefore, the jury instructions in Roque's case correctly stated the law regarding the State's rebuttal of Roque's

mitigating evidence.  There was no error.

### 4.  Lack of Special Verdict Forms for Mitigation Findings

¶141    Roque asserts that this court cannot conduct a meaningful review of aggravating and mitigating factors under A.R.S. § 13-703.04 unless the jury uses special verdict forms indicating which mitigating factors the jurors found.  We considered and rejected this argument in *Roseberry*, 210 Ariz. at 373, ¶ 74 & n.12, 111 P.3d at 415 & n.12.

## H.  Other Penalty Phase Issues

### 1.  Seeking the Death Penalty Based on the Race, Ethnic Background, or Religion of the Victim

¶142    Roque's murder victim, Balbir Sodhi, was a Sikh of Indian descent, and the State consulted with representatives of the Indian government in deciding whether to seek the death penalty in Roque's case.  Roque now asserts that the State's decision to seek the death penalty against him based on the race, ethnic background, and religion of the victim violates the Eighth and Fourteenth Amendments.  We review this matter of constitutional law de novo.  *Moody*, 208 Ariz. at 445, ¶ 62, 94 P.3d at 1140.

¶143    In *McCleskey v. Kemp*, the Supreme Court explained that, to make a claim under the Equal Protection Clause of the Fourteenth Amendment, the defendant must show purposeful discrimination that had a discriminatory effect on him in his

- 72 -

particular case. 481 U.S. 279, 292 (1987) (citations omitted). Moreover, the Court observed, because the criminal justice system functions best if prosecutors have "wide discretion" in deciding whether to seek the death penalty, a defendant must show "exceptionally clear proof" of discrimination for the Court to infer discriminatory purpose. *Id.* at 296-97. Any legitimate explanation for a state's decision to seek the death penalty precludes a finding of a Fourteenth Amendment violation. *Id.* at 297. The Court further explained that, to avoid arbitrary and capricious sentencing in violation of the Eighth Amendment, a state must narrow the class of murderers subject to capital punishment to allow the sentencer to make a principled distinction between those who deserve the death penalty and those who do not, *id.* at 303, and must not "limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty," *id.* at 306.

¶144 In Arizona, the state may seek the death penalty if it can prove beyond a reasonable doubt that a defendant committed first degree murder and can also prove the existence of at least one aggravating factor. A.R.S. § 13-703. The State met those statutory requirements in this case. Roque cites no case in which a defendant similarly situated was not made subject to the death penalty, and he makes no effective argument that a state may not consider the views of the government of a foreign

country with respect to the murder of someone born there. Because the State has wide discretion in deciding whether to seek a death sentence and had a legitimate reason to seek the penalty in this case, the State did not violate the Eighth Amendment or the Fourteenth Amendment by consulting with the Indian government.

2.  <u>Seeking the Death Penalty for the Mentally Retarded</u>

¶145    Before trial, Roque had the opportunity to attempt to prove that mental retardation should bar the imposition of death as a penalty in his case, but he declined to submit to the required testing. *See* A.R.S. § 13-703.02 (Supp. 2002) (providing pretrial procedure for establishing mental retardation). At trial, a defense expert testified that Roque's full-scale IQ is 80, with individual intelligence indices ranging from 71 to 95. Roque now claims that he is mentally retarded and thus not subject to execution. *See Atkins*, 536 U.S. at 321. Because he failed to raise this claim below, we review for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

¶146    Execution of the mentally retarded constitutes cruel and unusual punishment and thus is prohibited. *Atkins*, 536 U.S. at 321. Rather than defining precisely what mental retardation means, the Supreme Court "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional

restriction." *Id.* at 317. Arizona has prohibited execution of the mentally retarded since before *Atkins*, using a procedure detailed in A.R.S. § 13-703.02. *See State v. Grell* (*Grell II*), 212 Ariz. 516, 520, ¶ 15 & n.5, 135 P.3d 696, 700 & n.5 (2006).

¶147 Under the statutory procedure, the court appoints a prescreening psychological expert to determine a defendant's IQ. A.R.S. § 13-703.02(A).[12] If that test returns a full-scale IQ result of 75 or below, the court appoints additional experts to test the defendant again. A.R.S. § 13-703.02(C). If any of those full-scale IQ test results are 70 or below, the court must hold a hearing on the issue of mental retardation. A.R.S. § 13-703.02(F). To establish mental retardation, the defendant must then prove that he also has adaptive deficits and that onset of the condition occurred before age 18. A.R.S. § 13-703.02(I)(2).

¶148 Roque admits that he has a full-scale IQ of 80, but asks us to look to his "processing speed index" of 71. Given the test's five point margin of error, he argues, this score could be below 70. Roque therefore argues that he cannot be executed.

¶149 This analysis is flawed for two reasons. First, in leaving the definition of mental retardation to the states, the

---

[12] In 2002, after Roque began this process, the legislature modified A.R.S. § 13-703.02 by adding a new subsection (A) and redesignating sections A to J as B to K. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1.

Supreme Court did not require that execution be prohibited for all who could score below a certain number on an IQ test or a portion of such a test. Rather, the prohibition depends on the state's definition of mental retardation. *See Grell II*, 212 Ariz. at 525, ¶ 37, 135 P.3d at 705 (citing *Atkins*, 536 U.S. at 317). Applying accepted medical definitions, the Arizona statute makes IQ one of three prongs in the definition of mental retardation. A.R.S. § 13-703.02(I)(2). A low IQ score, standing alone, does not automatically mean the defendant has mental retardation or that he cannot be executed.

¶150 Second, Roque misinterprets the statute. The statute does not refer to individual IQ sub-tests or indices, but rather employs a single "intelligence quotient" as an initial measure of "significantly subaverage general intellectual functioning." A.R.S. § 13-703.02(A), (I)(2). This number refers to the full-scale IQ, which for Roque is 80. In addition, the statute accounts for margin of error by requiring multiple tests. If the defendant achieves a full-scale score of 70 or below on any one of the tests, then the court proceeds to a hearing. Even were we to consider the six sub-test numbers presented in the defense expert's testimony, not one of them is 70 or below, and all but the processing speed index are above 75. Roque has presented no evidence indicating that he has mental retardation as defined under Arizona law, and thus the court did not err,

much less commit fundamental error, in not finding Roque to have mental retardation.

## I.   Alleged Prosecutorial Misconduct

¶151    Roque asserts that twenty-eight incidents of prosecutorial misconduct occurring throughout the guilt and sentencing proceedings denied him a fair trial.  We have addressed fifteen of the alleged incidents elsewhere in this opinion, and, of those, only the State's failure to disclose the scope of Dr. Ben-Porath's testimony warrants inclusion here. Roque also alleges thirteen additional incidents, which we now address.

¶152    In *State v. Hughes*, reviewing a case we called a "masterpiece of misconduct," we held that the cumulative effect of seven incidents of prosecutorial misconduct denied the defendant a fair trial.  193 Ariz. 72, 83, 88, ¶¶ 50 & 74, 969 P.2d 1184, 1195, 1200 (1998).  *Hughes* set forth the test for reversal based on prosecutorial misconduct as follows:

> [A] defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.   To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct.

*Id.* at 79, ¶ 26, 969 P.2d at 1191 (citations and quotations

omitted). "Prosecutorial misconduct is harmless error if we can find beyond a reasonable doubt that it did not contribute to or affect the verdict." *Id.* at 80, ¶ 32, 969 P.2d at 1192.

¶153 This court is "not eager to reverse a conviction on grounds of prosecutorial misconduct as a method to deter . . . future conduct," *id.* (citation omitted), but we "emphasize that the responsibilities of a prosecutor go beyond the duty to convict defendants," *id.* ¶ 33. The prosecutor has a duty as a "minister of justice" to "see that defendants receive a fair trial." *Id.* (citing Ariz. R. Sup. Ct. 42, ER 3.8).

¶154 The first step in evaluating Roque's prosecutorial misconduct claim is to review each alleged incident to determine if error occurred. For each alleged incident, our standard of review depends on whether Roque objected at trial. If he objected, the issue was preserved. *Id.* at 85, ¶ 58, 969 P.2d at 1197. If he failed to object, we review only for fundamental error. *Id.*

¶155 But even if there was no error or an error was harmless and so by itself does not warrant reversal, an incident may nonetheless contribute to a finding of persistent and pervasive misconduct, *id.* at 79, ¶ 25, 969 P.2d at 1191, if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and "did so with indifference, if not a specific intent, to prejudice the

defendant," *id.* at 80, ¶ 31, 969 P.2d at 1192. After reviewing each incident for error, we must assess whether the incident should count toward Roque's prosecutorial misconduct claim. Once the incidents contributing to a finding of misconduct are identified, we must evaluate their cumulative effect on the trial.

¶156 We address only those allegations of misconduct that merit extended discussion. *See State v. Anderson* (*Anderson II*), 210 Ariz. 327, 341, ¶ 48, 111 P.3d 369, 383 (2005). Eleven of Roque's thirteen additional allegations of misconduct do not merit such discussion; they concern either properly admitted evidence, questions with a sufficient basis, accurate statements, or reasonable arguments from the facts. *See id.* Those eleven allegations of misconduct are listed in an appendix to this opinion. We discuss the remaining allegations of misconduct below.

1. Prosecutor's Testimony on Validity of Tests

¶157 The second chair prosecutor cross-examined Dr. Barry, a defense expert. At one point, she said, "Now, when I talked to you, when you came to our interview, [defense counsel] had already told you that I thought that the [MMPI-2] test was invalid, correct?" The court overruled the defense objection to the prosecutor stating "what she believes is the result of this test." We review the court's ruling for abuse of discretion.

*Aguilar*, 209 Ariz. at 49, ¶ 29, 97 P.3d at 874.

¶158    This question improperly injected the prosecutor's opinion of the validity of a psychiatric test.  Even if the prosecutor believed that the MMPI-2 had been invalidly administered, she could not testify as such.  *See In re Zawada*, 208 Ariz. 232, 239-40, ¶¶ 26-27, 92 P.3d 862, 869-70 (2004). The judge therefore should have sustained the objection to this question.

¶159    Any error, however, was harmless.  It was uncontested that the State had questioned the first administration of the MMPI-2.   While the prosecutor should not have offered her opinion on the matter, the question, by itself, simply established the context for the re-administration of the MMPI-2. Thus, this question did not contribute to or affect the verdict. We nonetheless consider it as an incident that may contribute to an overall finding of cumulative prosecutorial misconduct.

    2.   Harassment of Witness

¶160    The second chair prosecutor also aggressively cross-examined Dr. Toma, another defense expert.  In reference to Dr. Toma's education, the prosecutor asked if his school "was started by a bunch of teachers offering classes to the people in New York on things like acupuncture and that sort of thing." The record provides no basis for such a disparaging remark.  She also attempted to ridicule the doctor's publications and other

qualifications. Roque did not object to the prosecutor's questioning of Dr. Toma at trial, so we review only for fundamental error. *Hughes*, 193 Ariz. at 85, ¶ 58, 969 P.2d at 1197.

¶161 With respect to the prosecutor's questioning of an expert, we cautioned that "a prosecutor cannot attack the expert with non-evidence, using irrelevant, insulting cross-examination and baseless argument designed to mislead the jury and undermine the very purpose of [Rule 11 of the Arizona Rules of Criminal Procedure]." *Zawada*, 208 Ariz. at 237, ¶ 14, 92 P.3d at 867 (citing Ariz. R. Sup. Ct. 42, ER 3.4(c)). In her cross-examination, the second chair prosecutor appeared to intentionally raise baseless challenges to Dr. Toma's qualifications. While questioning an expert's qualifications is proper to assist the jury in assessing the expert's credibility, *State v. Hummert*, 188 Ariz. 119, 126, 933 P.2d 1187, 1194 (1997), Ethical Rule 3.4(e) requires that the questioning have some factual basis. In this case, the bases of many of the prosecutor's questions were, at best, unclear and, at worst, non-existent. We conclude, however, that the impact of the prosecutor's questioning was not of such magnitude that it denied Roque a fair trial. Dr. Toma handled the questions effectively, thereby reducing any prejudicial impact. The prosecutor's questioning of Dr. Toma nonetheless constitutes an

incident of misconduct that, while not individually reversible, contributes to our analysis of cumulative prosecutorial misconduct.

### 3. Non-Disclosure of Expert Testimony

¶162    We have previously addressed the prosecutors' failure to disclose to the defense the scope of Dr. Ben-Porath's testimony on the critical issue of Roque's mental condition. *See supra* ¶¶ 21-52. We must also assess whether the State's failure constitutes an incident of misconduct.

¶163    The prosecutors had an obligation to disclose, which they did not fulfill. Although the trial court found that the prosecution did not intend to mislead the defense, the prosecutors conceded that they knew they had not disclosed the extent of Dr. Ben-Porath's testimony. Because the prosecutors should have known that their failure to disclose was improper and was likely to prejudice the defendant, we consider the failure to disclose in our analysis of cumulative prosecutorial misconduct.

### 4. Cumulative Effect

¶164    Three incidents contribute to our overall assessment of cumulative prosecutorial misconduct. The prosecutors testified as to the validity of tests, asked a defense expert harassing and unfounded questions, and failed to disclose the extent of the State expert's testimony on the central issue in

this capital case.  Even though none of these incidents by itself warrants reversal, we look to the cumulative effect of the incidents.  *Hughes*, 193 Ariz. at 79, ¶ 25, 969 P.2d at 1191.

**¶165**     Under the *Hughes* test, we cannot say that the cumulative effect of the misconduct here so permeated the entire atmosphere of the trial with unfairness that it denied Roque due process.  *See id.* ¶ 26.  We recognize in particular that the prosecutors' failure to disclose the scope of Dr. Ben-Porath's testimony was improper and potentially prejudicial, but the defense did not make a good faith effort to resolve that discovery dispute.  As a result, we cannot now assess the prejudice the defendant may ultimately have suffered.  The cumulative effect of the incidents of misconduct in this case thus does not warrant reversal.  *See id.* at 80, ¶ 32, 969 P.2d at 1192.

**J.   Independent Review**

**¶166**     Because Roque's crimes were committed before August 1, 2002, we independently review the aggravating circumstances and the mitigating evidence in this case and assess the propriety of imposing the death sentence.  *See* A.R.S. § 13-703.04(A); 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(B).  In our assessment, "we consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118

(1998).

**¶167**      Based on our independent review of the record, we conclude that the (F)(3) aggravating factor was proven beyond a reasonable doubt.  We also conclude that the (F)(2) aggravating factor based on Roque's 1983 attempted robbery conviction was properly dismissed by the trial court and that the State failed to prove beyond a reasonable doubt the (F)(2) aggravating factor based on Roque's conviction for the attempted murder of Khalil.

**¶168**      As mitigation, A.R.S. § 13-703(G)(1) instructs us to consider whether Roque's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."  On that issue, the evidence shows that Roque's mother was a schizophrenic, leaving Roque predisposed to mental health problems.  All four mental health experts who testified at trial regarding Roque's mental condition on the days after September 11, 2001, agreed that his mental condition impaired his capacity to conform to the law, but varied in their opinions of how significant that impairment was.[13]  The defense experts concluded that Roque was legally insane at the time of the commission of

---

[13]    For reasons discussed in this opinion, we give little weight to Dr. Ben-Porath's assessment of Roque's mental health. In addition, while Dr. Toma also testified, he never gave an assessment of Roque's mental condition.

his crimes. The court-appointed expert concluded that Roque suffered from either a psychotic disorder or an acute stress disorder that significantly impaired his capacity to conform to the law at the time of the commission of his crimes. Even the State's expert concluded that Roque suffered from an "adjustment disorder with depressed mood" that caused an emotional and behavioral reaction to the events of September 11, 2001. We give this mitigating evidence substantial weight. *See State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997) (in setting aside death sentence, giving serious consideration to defendant's mental illness because of its impact on defendant's capacity to conform to the law); *State v. Doss*, 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977) (finding defendant's mental condition a "substantial factor in causing the death of the victim" and therefore setting aside sentence of death).

¶169 From the non-statutory mitigating evidence presented in this case, we also consider Roque's low IQ as mitigation. Roque's IQ was measured at 80. While Roque's IQ is not, by itself, low enough for him to be considered to have mental retardation, his overall score is below average. Although mitigating evidence need not bear a nexus to the crime, *Tennard*, 542 U.S. at 289, the relationship between mitigating evidence and the murder may affect the weight given to the mitigating evidence, *see Anderson II*, 210 Ariz. at 357, ¶ 136, 111 P.3d at

399. We consider the mitigating evidence of Roque's low IQ and its likely impact on Roque's ability to seek help or reason his way out of committing the crimes.

¶170    The substantial mitigating evidence balanced against a single (F)(3) aggravating factor causes us to question whether a sentence of death is warranted in this case. *See State v. Rockwell*, 161 Ariz. 5, 16, 775 P.2d 1069, 1080 (1989). We recognize the serious nature of Roque's crime; the murder of Sodhi was part of a shooting spree that targeted victims based on their assumed ethnicity. As we have noted in the past, "[o]ur task in evaluating and weighing the proffered mitigation is difficult at best. There is no scale upon which to measure what is or is not 'sufficiently substantial.'" *Trostle*, 191 Ariz. at 23, 951 P.2d at 888. But taken as a whole, the mitigating evidence here raises a substantial question whether death is an appropriate sentence. *See id.* When "there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v. Valencia*, 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982). We have such a doubt in this case, and therefore conclude that the death penalty should not be imposed. Because of the serious nature of Roque's crimes, however, we conclude that he should be imprisoned for the rest of his natural life and never be released. *See* A.R.S. §§ 13-703(A), -703.04(B).

## III. CONCLUSION

¶**171** Defendant's convictions and non-capital sentences are affirmed. His sentence of death is reduced to natural life imprisonment without possibility of release.[14]

_____
Rebecca White Berch, Vice Chief Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice


_____
Daniel A. Barker, Judge*


*Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Daniel A. Barker, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

---

[14] Because we vacate Roque's death sentence, the ten claims he raised regarding the constitutionality of the death penalty are moot.

**Appendix**

The eleven allegations of prosecutorial misconduct that do not merit extended discussion are as follows:

1.  The prosecutor's statement that "there is no evidence of the defendant saying anything about voices, except in a report from the Sheriff's Department that somebody wrote" was a reasonable statement of the evidence, unlike the statements in *Hughes*. *See* 193 Ariz. at 85-86, ¶¶ 59-60, 969 P.2d at 1197-98.

2.  The prosecutor's statement that "some of the psychiatrists and psychologists . . . are asking you to try to excuse [Roque's] conduct to some extent, because of the impact that a terrorist attack had on him when that's exactly what he did" was a reasonable summary of expert testimony, unlike the summary in *Hughes*. *See id.* ¶¶ 59-61.

3.  The prosecutor's request that "you make your decision based solely on the facts, the facts of what occurred and not a distorted version of them as provided by the defendant in his interviews" was not calculated to direct the jurors' attention to Roque's exercise of his Fifth Amendment privilege not to testify, unlike the situation in *Hughes*. *See id.* at 87, ¶¶ 64-66, 969 P.2d at 1199.

4.  The prosecutor's questions, **"**And you're saying that [psychiatry] is a science as opposed to an art? . . . And you can be wrong, correct? . . . And you might be wrong in this case?" were proper questions regarding the reliability of psychiatric assessments, unlike the questions in *Hughes*. *See id.* at 84-85, ¶ 55, 969 P.2d at 1196-97.

5.  The prosecutor's question that, "in fact, you worked with defense counsel, Mr. Stein, on a case" was a proper question regarding the expert's possible bias or motive. *See State v. Bailey*, 132 Ariz. 472, 478, 647 P.2d 170, 176 (1982).

6.  The prosecutor's statement, "what I would say if I was a juror, I would discount [Dr. Rosengard's] opinion," while inartful and arguably improper, did

not clearly insert the prestige of the government into the jury's credibility assessment, unlike the statement in *State v. Hill*, 109 Ariz. 93, 95, 505 P.2d 553, 555 (1973). Furthermore, Roque did not object to the statement, so the trial court had no opportunity to correct any possible improper implication.

7. The prosecutor's use of the phrase "so-called medical experts" was invited by the defense through its use of the same phrase. *See State v. Logan*, 200 Ariz. 564, 565-66, ¶ 9, 30 P.3d 631, 632-33 (2001). While the use of this phrase by both parties was unprofessional, it did not rise to the level of the prosecutor's comments in *Hughes*. *See* 193 Ariz. at 86, ¶ 61, 969 P.2d at 1198.

8. Comments by the prosecutor associating Roque with the 9/11 terrorists were invited, were prompted by defense counsel's arguments, and were pertinent to the circumstances of Roque's crimes. *See Trostle*, 191 Ariz. at 16, 951 P.2d at 881.

9. The prosecutor's statements, "[Y]ou weren't asked to consider [the 1983 attempted robbery conviction] and determine whether it was an aggravating factor. There are legal reasons for that that don't matter. The point is, it's evidence you can consider [in the penalty phase]." were not an improper reference to inadmissible evidence, unlike the reference in *State v. Leon*, 190 Ariz. 159, 161-62, 945 P.2d 1290, 1292-93 (1997).

10. The prosecutor's question in the penalty phase, "So you're aware of the attempted robbery incident in which [Roque] was involved in 1983, correct?" was not an attempt to introduce inadmissible evidence to rebut the defendant's mitigating evidence. *See* A.R.S. § 13-703(C).

11. The prosecutor's introduction of Sodhi's autopsy photos was proper. *See State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).