NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

QUEINTEN DAVON MCDOWELL, *Appellant.*

No. 1 CA-CR 15-0669
FILED 10-13-2016

Appeal from the Superior Court in Maricopa County
No. CR2012-005754-002
The Honorable Danielle J. Viola, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jillian Francis
*Counsel for Appellee*

The Law Office of Kyle T. Green, Tempe
By Kyle Green
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Andrew W. Gould delivered the decision of the Court, in which Judge Peter B. Swann and Judge Patricia A. Orozco joined.

---

**G O U L D**, Judge:

¶1 Queinten Davon McDowell appeals his convictions and sentences for first-degree murder and armed robbery. For the reasons that follow, we affirm.

### BACKGROUND[1]

¶2 In autumn 2011, Lee Shine and William McIntyre shared an apartment. Unemployed, the young men spent most of their time using drugs and playing video games. Sometime in late September or early October 2011, McDowell and Joe Jasso approached McIntyre outside his apartment complex and inquired where they could buy marijuana. McIntyre invited McDowell and Jasso up to his apartment, and they essentially moved in, spending their days playing video games and using drugs with Shine and McIntyre.

¶3 Eventually, the young men ran out of money and drugs, and Shine offered to sell his laptop to acquire both. Jasso volunteered that he knew someone who would buy it and contacted the victim. Jasso and McDowell then met with the victim and traded the laptop for marijuana. When Jasso and McDowell returned with the drugs, Shine was upset that he did not receive any money in the exchange. He also believed the value of the marijuana received was far less than the value of the laptop. Believing he had been cheated, Shine suggested robbing the victim.

¶4 A conversation followed in which the four men discussed various ways to rob the victim. Initially, the men were "kidding," but as they revisited the matter over the next few days, the tone turned serious, and Shine offered to kill the victim with a knife. Jasso rejected that idea, believing the victim, who did not know Shine, would be suspicious if Shine

---

[1] We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

approached him and would never allow Shine within stabbing distance. After further discussion, Jasso and McDowell decided they would attack the victim and "make it right."

¶5　　　　As the plans finalized, McIntyre gave Jasso and McDowell a gun, and McDowell volunteered to kill the victim. On October 22, 2011, Jasso contacted the victim and arranged a meeting under the pretense of purchasing marijuana. Shine left to visit his grandparents and McIntyre waited at the apartment while Jasso and McDowell met with the victim.

¶6　　　　When Jasso and McDowell returned a short time later, Jasso was covered in blood. "[E]xcited," Jasso and McDowell told McIntyre that they initially met with the victim inside the victim's car, but McDowell then exited the backseat on the driver's side and shot the victim through the open driver's side window. Jasso, still inside the vehicle at the time of the shooting, grabbed all the drugs he could find before jumping out of the rolling car. After relaying the events of the murder, McDowell returned the gun to McIntyre, but asked to keep the expended shell casing as a "trophy."

¶7　　　　Later that evening, police were conducting a routine patrol when they received a call from dispatch regarding a report of a suspicious vehicle. As the officers responded to the scene, they saw the reported vehicle in the front yard of a private residence, positioned next to a tree with its lights on and the engine running. One officer looked through the open driver's side window and observed the victim seated in the driver's seat, but "slumped over," with his head resting on the passenger front seat. The victim's eyes were open and he was "slightly convulsing." From his position on the passenger's side, another officer saw that the victim had sustained a gunshot wound to his head. The officers immediately requested emergency assistance. Notwithstanding the efforts of medical personnel, however, the victim died from the gunshot wound.

¶8　　　　After medical personnel transported the victim, additional officers arrived at the crime scene. They obtained a search warrant for the vehicle and seized the victim's cellular phone, which had fallen off his person when medical personnel extracted him from the car.

¶9　　　　A detective later analyzed the cellular phone's call and message history and noted numerous contacts from a single number during the hours preceding the homicide. All contact from that number stopped, however, after the shooting. The detective traced the phone number to Jasso's mother and then traveled to Colorado to interview Jasso. During the interview, Jasso inculpated himself, McDowell, McIntyre, and Shine in

the victim's murder. The detective subsequently interviewed McDowell, who initially denied any involvement, but later admitted his participation when confronted with Jasso's statements.

¶10        When police questioned Shine, he admitted that the men had planned to kill the victim before he left for his grandparents' home. Shine explained that Jasso and McDowell offered to rob and "kill" the victim as retribution for the laptop exchange, and he accepted their offer.

¶11        McDowell was charged with one count of first-degree murder and one count of armed robbery. The State also alleged numerous aggravating circumstances.

¶12        At trial, McIntyre testified that he, Shine, Jasso, and McDowell conspired to commit robbery, but also discussed killing the victim. Indeed, just before leaving the apartment to meet the victim, McDowell said "Why don't we just kill him." Jasso testified that he and McDowell discussed killing the victim to avoid any possible retaliation, and McDowell agreed to act as the shooter.

¶13        McDowell confessed to shooting the victim, but claimed it was a "snap" decision with no premeditation. Nonetheless, he acknowledged that he told the other men "we need to kill this dude" because he feared the victim may retaliate for the robbery, and further admitted that he volunteered to kill the victim.

¶14        The jury convicted McDowell as charged, concluding he committed both premediated and felony murder as well as armed robbery. The jury also found two aggravating factors: (1) the offense involved the presence of an accomplice, and (2) the offense was committed for pecuniary gain. The trial court sentenced McDowell to natural life without the possibility of release for first-degree murder and a concurrent, presumptive term of ten and one-half years' imprisonment for armed robbery. McDowell timely appealed.

## DISCUSSION

¶15        At trial, Jasso testified that he, McDowell, Shine, and McIntyre discussed murdering the victim as a means of avoiding any possible retaliation for the robbery. He also testified that he and McDowell privately discussed who would act as the shooter and McDowell volunteered.

¶16        Following the State's direct examination of Jasso, defense counsel moved for a mistrial, arguing Jasso's trial testimony was contrary

to statements he had made during police and defense interviews, and the State had failed to timely disclose this change in story/impeachment material after the prosecutor learned the details of Jasso's account during a pretrial interview. The trial court denied the motion to dismiss, but granted defense counsel additional time to interview Jasso before conducting cross-examination.

¶17 Later, the trial court denied defense counsel's renewed motion for mistrial and motion to strike Jasso's testimony, concluding "that the evidence does not call the government's case into doubt; that there was no willful—or direct or indirect failure of the state—to fail to disclose evidence." Specifically, the court found that the factual basis for Jasso's plea agreement provided defense counsel with sufficient notice of his subsequent trial testimony. The court also concluded that McDowell had not been prejudiced by any alleged lack of disclosure because defense counsel was provided additional time to interview Jasso before conducting cross-examination. The court also found that defense counsel's claim that McDowell would have entered a plea agreement had Jasso's intended trial testimony been disclosed was entirely speculative because the State had never extended McDowell a plea offer.

## I.    *Brady* **Violation**

¶18 McDowell argues the trial court erred by denying his motion for mistrial predicated on a *Brady* violation.

¶19 We review the denial of a motion for mistrial for an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000). Because a "declaration of a mistrial is the most dramatic remedy for trial error," it should be granted "only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983).

¶20 Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to disclose all "evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Because "the reliability of a given witness may well be determinative of guilt or innocence," the government must disclose all evidence affecting the witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (internal quotation omitted).

¶21 "The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury." *State v. Jessen*, 130 Ariz. 1, 4 (1981). "When previously

undisclosed exculpatory information is revealed at the trial and is presented to the jury, there is no *Brady* violation." *Id*.

¶22 Applying these principles here, there was no *Brady* violation. Even assuming that the State failed to timely disclose impeachment material regarding Jasso, it is undisputed that the information was presented to the jury. Indeed, after the prosecutor directly examined Jasso, and defense counsel raised his objection, the trial court afforded defense counsel additional time to interview Jasso before recalling him for cross-examination. During the subsequent cross-examination, defense counsel[2] thoroughly impeached Jasso with his prior statements, eliciting admissions that Jasso lied to police, lied to defense counsel, lied to his mother, and simply lied "incessantly" when he previously claimed that the men had only planned a robbery and McDowell, unexpectedly, "got mad and just shot" the victim. Indeed, Jasso acknowledged that he had "hustled" the police and defense counsel throughout the case. Therefore, the trial court did not abuse its discretion by denying McDowell's motion for mistrial predicated on a *Brady* violation.

## II.     Rule 15 Disclosure Violation

¶23 McDowell contends the trial court erred by denying his motion to strike Jasso's testimony as a sanction. Specifically, McDowell argues the prosecutor was required to disclose that Jasso intended to testify that the men conspired to kill the victim. According to McDowell, this testimony was contrary to Jasso's police and defense interview statements, and therefore constituted "new or different" information that the State was required to supplement pursuant to Rule 15.

¶24 On November 21, 2013, Jasso participated in a free talk with police. Jasso initially explained that the men only planned a "grab and run" to steal drugs from the victim, but later acknowledged the men had also discussed the possibility of killing the victim. When pressed on that point, Jasso claimed there was no definite plan to kill the victim, it was simply a possibility if the robbery did not go well. He acknowledged, however, that McDowell stated they "should kill [the victim] anyway," even if the robbery was successful.

---

[2]     Shine and McDowell were tried together. Shine's attorney cross-examined McDowell first and elicited most of the admissions.

¶25        On June 19, 2014, Jasso entered a plea agreement, pleading guilty to second-degree murder.  The factual basis supporting the plea states:

> On or before October 22, 2011, Defendants Joe Anthony Jasso, Queinten McDowell, William McIntyre, and Lee Shine conspired together to lure [the victim] to a meeting, at which he would be shot and most likely killed.  The four of them conspired in the planning.  Defendant McIntyre provided the handgun.  Defendant Jasso called the victim and arranged a meeting.  On October 22, 2011, Defendants Jasso and McDowell met with the victim . . ., and Defendant McDowell shot the victim, causing his death.  Defendants Jasso and McDowell met back up with Defendants Shine and McIntyre after the murder.  Defendant McDowell returned the gun to Defendant McIntyre.

¶26        The purpose of the disclosure rules is "to give full notification of each side's case-in-chief so as to avoid unnecessary delay and surprise at trial."  *State v. Roque*, 213 Ariz. 193, 207, ¶ 32 (2006).  We review a trial court's "assessment of the adequacy of disclosure for an abuse of discretion."  *Id.* at 205, ¶ 21.  We likewise review a trial court's ruling on sanctions for untimely disclosure for an abuse of discretion.  *Id.*

¶27        As set forth in Rule 15.1(b)(1), the State is required to disclose any witnesses the prosecutor intends to call during the State's case-in-chief, "together with their relevant written or recorded statements."  Additionally, pursuant to Rule 15.1(b)(8), the State is required to disclose all information within its possession "which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce the defendant's punishment."  After providing its initial disclosure to the defense, the State bears a continuing duty to disclose "whenever new or different information subject to disclosure is discovered."  Ariz. R. Crim. P. 15.6.

¶28        In presenting the motion to strike Jasso's testimony, defense counsel argued "[n]owhere in any of the interviews nor in the factual basis does [Jasso] ever give such exacting details about a plan to commit murder as opposed to robbery."  The trial court acknowledged that Jasso's trial testimony contained some "details not previously stated" in his factual basis or police and defense counsel interviews, but found the substance of Jasso's trial testimony was consistent with the written statement he adopted

7

as part of his plea agreement, which had been timely disclosed to defense counsel.

¶29 Consistent with the trial court's finding, the record reflects that the material substance of Jasso's trial testimony was timely disclosed. The factual basis for Jasso's plea stated that the men "conspired to lure" the victim to a meeting where he "would be shot and most likely killed." Jasso also told police that the men had discussed killing the victim, as a contingency for a failed robbery, and McDowell stated that they should kill the victim even if the robbery went well. Therefore, because the State timely disclosed these statements encompassing the substance of Jasso's trial testimony, the trial court did not abuse its discretion by finding the State complied with the disclosure rules. *See State v. Guerrero*, 119 Ariz. 273, 276 (App. 1978) ("The criminal discovery rules do not require the state to provide a word-by-word preview to defense counsel of the testimony of the state's witnesses.") (internal quotation omitted).

¶30 Moreover, even assuming that the State failed to comply with Rule 15.6's mandate to supplement disclosure with new or different information, the trial court acted well within its discretion by denying defense counsel's motion to strike. Pursuant to Rule 15.7, the trial court "shall impose any sanction it finds appropriate" when a party fails to comply with the disclosure rules, "unless the court finds that the failure to comply was harmless." Here, the trial court granted defense counsel additional time to interview Jasso and prepare for cross-examination. The court could have reasonably concluded that allowing defense counsel additional time to interview and prepare ameliorated any possible prejudice from an untimely disclosure.

¶31 The trial court also could have reasonably concluded that any untimely disclosure was harmless. At trial, the State introduced Shine's police statement acknowledging that Jasso and McDowell offered to kill the victim and he accepted their offer. In addition, McIntyre testified that the men discussed killing the victim and McDowell advocated for that plan. Equally important, McDowell admitted that he told the others "we need to kill this dude" and then volunteered to shoot the victim. Given this overwhelming evidence that the men in general, and McDowell in particular, planned to kill the victim, any untimely disclosure was harmless and the trial court did not abuse its discretion by denying McDowell's motion to strike.

### III. Prosecutorial Misconduct

**¶32** McDowell argues the trial court erred by denying his motion for mistrial predicated on a claim of prosecutorial misconduct. Specifically, McDowell contends the prosecutor engaged in misconduct by failing to disclose "impeachment evidence" and impugning defense counsel.

**¶33** During closing argument, the prosecutor stated: "Now, we have in trials what people refer to as smoke and mirrors or red herrings, but basically things that are thrown into a trial to distract the jury and make them focus on—." At that point, defense counsel asked to approach and argued that the prosecutor had committed an ethical violation by "talking about red herrings and whatnot." The trial court overruled the objection. Later, the prosecutor again referenced "smoke and mirrors . . . distracting the jurors." Defense counsel again objected and the trial court overruled the objection. At the close of the prosecutor's argument, defense counsel moved for a mistrial, claiming the prosecutor implied that defense counsel had been deceitful. The trial court denied the motion.

**¶34** To prevail on a claim of prosecutorial misconduct, a defendant "must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Roque*, 213 Ariz. at 228, ¶ 152. "Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*.

**¶35** Although prosecutors have wide latitude in closing argument, "[j]ury argument that impugns the integrity or honesty of opposing counsel is [] improper." *State v. Hughes*, 193 Ariz. 72, 86, ¶ 59 (1998); *see State v. Hill*, 174 Ariz. 313, 322 (1993). Criticism of defense theories and tactics, on the other hand, "is a proper subject of closing argument." *State v. Ramos*, 235 Ariz. 230, 238, ¶ 25 (App. 2014) (internal quotations omitted).

**¶36** With respect to McDowell's first claim, the prosecutor did not engage in misconduct by failing to supplement the State's disclosures regarding Jasso. *Supra*, ¶¶ 23-29. As to McDowell's second claim that the prosecutor's comments suggested defense counsel was deceitful and attempting to mislead the jury, we conclude the comments were not personal attacks on defense counsel's integrity, but permissible critiques of defense tactics. Therefore, the trial court did not abuse its discretion by denying McDowell's motion for mistrial.

## CONCLUSION

¶37     McDowell's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA